STANLEY J. BELTH, PETITIONER-RESPONDENT, v. ANTHONY FERRANTE & SON, INC., DEFENDANT-APPELLANT.

Argued January 11, 1966—Decided April 4, 1966.

*Mr. Isidor Kalisch* argued the cause for defendant-appellant.

*Mr. John W. O'Brien* argued the cause for petitioner-respondent (*Messrs. O'Brien, Brett & O'Brien,* attorneys).

The opinion of the court was delivered by

FRANCIS, J. Petitioner, Stanley J. Belth, was awarded workmen's compensation representing 75% loss of his left leg against the defendant-employer, Anthony Ferrante & Son, Inc. The County Court reduced the award to 10% loss of the leg for reasons to be discussed hereafter. The Appellate Division reversed and reinstated the original award. 88 *N. J. Super.* 9 (*App. Div.* 1965). We granted certification on the employer's petition. 45 *N. J.* 586 (1965).

The nature of the case makes necessary an outline of its factual background.

On August 2, 1954, while operating his motorcycle along Route 22 in Somerset County, N. J., Belth was in collision with an automobile. He was taken to the hospital in Bound Brook, N. J. where examination disclosed substantial injuries to his left leg (as well as other injuries which are not material

in this case). More specifically he suffered compound, comminuted fractures of the left tibia and fibula. The fracture of the tibia entered the knee joint spaces at several sites. Open reduction operations were necessary; healing was complicated by bone infection. At these operations some portions of broken and diseased bone were removed. Hospitalization continued until April 8, 1955, at which time the fractures were well healed. Belth was readmitted to the hospital on September 27, 1955 with a draining sinus at the site of the open reduction incision. Another operation occurred, the bone underlying the incision was curetted and the affected portion of the bone removed. Discharge followed on December 23, 1955, the diagnosis being osteomyelitis.

Thereafter the leg improved and he went to work as a welder and truck driver for defendant-appellant some time in 1956; the exact date does not appear. At the time of the accidents with which we are concerned, he was working as a dump truck driver.

There is no doubt that the motorcycle accident resulted in some permanent disability of the left leg. It was shorter and weaker than the right leg, and at the conclusion of medical treatment in 1956, there was considerable stiffness in the knee joint. He walked with a limp. It should be noted also, that the accident did not occur during the course of an employment, and consequently no workmen's compensation was ever awarded or paid on account of the injuries.

From the inception of Belth's employment in 1956 until October 22, 1958, he worked steadily and without incident. He limped, but said his leg was "three-quarters good" and that he had no difficulty doing the work assigned to him. On October 22, 1958 during the course of his work, he slipped while getting on his truck and injured the front midsection of his left leg. He continued work until October 25, 1958 when he fell from a ladder and struck the same area of his left leg on a piece of steel. The leg started to swell and a festering blister developed. The same day he sought treatment from a Dr. Konyha, who referred him to Dr. John Warter. Dr. War-

ter had him admitted to the Muhlenberg Hospital on October 27, 1958. The diagnosis was acute osteomyelitis of the left tibia in the region of the old fracture. An operation was performed on November 1. The entire middle third of the tibia was exposed by surgical incision, which revealed an infectious area in the bone "[w]hich was full of dirty necrotic granulation tissue and puss. This was thoroughly curretted out. The entire medullary canal of the tibia was then opened up into normal tissue, both proximally and distally and all of the sclerotic bone in the middle section, including the infected area, was removed and all overhanging lip was thoroughly rongeured off leaving a deep trough from normal bone to normal bone * * * extending through the infected area." The end result of the operation was to leave the tibia about half its normal thickness. He was discharged from the hospital on November 14, 1958, his condition being described as improved.

Thereafter Dr. Warter treated the leg for about a year and prescribed a leg brace which all the medical evidence indicates he must wear at all times. It consists of a metal rod which is anchored in the heel of Belth's shoe. Two connecting rods extend up above the knee and are there attached to a corset-like affair which is strapped tightly around the thigh. The perpendicular rods have hinges which permit motion at the knee. In describing his present condition Belth said his left ankle is stiff; he has to pick his leg up and "loosen it" before he starts to walk. He cannot walk any distance without stopping for a rest. He returned to work for Ferrante on April 1, 1959, but was "laid off."

Subsequently he did gardening work for about six months without mishap. Then he entered the employ of Thul Machine Works, where on November 10, 1960, while working, a piece of steel material fell on his left ankle. Severe pain and swelling of the leg followed and he was admitted to the Overlook Hospital where the leg was opened again and drained. Discharge took place on November 23, 1960, the final diagnosis being chronic osteomyelitis, left tibia. Belth

remained under medical care until March 15, 1961, when he was able to return to work.

Two petitions for workmen's compensation were filed by Belth. One sought an award against Ferrante for the accidents of October 22, 1958 and October 25, 1958; the other asked similar relief against Thul Machine Works, Inc. for the accident of November 10, 1960.

At the hearing all of the medical evidence demonstrated clearly that the 1958 accidents caused a flare-up in the quiescent osteomyelitis which made necessary the operative procedure that followed, including the saucerization of the tibia, and the resulting further weakening of the leg. On the subject of extent of disability one medical witness said that after the two compensable injuries in the Ferrante employment the over-all permanent disability of his left leg was 75%, and after the third injury in the Thul employment, it was 85%. Another such witness put the over-all impairment at 75%, with perhaps 5% chargeable to the third compensable injury. None of the expert medical witnesses who estimated petitioner's present disability attempted to assess the extent of impairment which followed the motorcycle accident of 1954. They agreed that some permanent loss of use resulted but could not express it in terms of percentage. Defendant produced one physician, Dr. Maxwell Borow, who had given some treatment to Bealth in connection with the 1954 injury. This witness, whose father was the treating physician, was admitted to practice medicine in 1954. Apparently he participated in the treatment of Belth but entered military service before the medical attention ended. He said he saw Belth a few times when home on leave and last saw him some time in 1956. He testified that at that time the disability was 65% loss of the leg; there was extensive muscle weakness and atrophy and almost complete loss of motion in the knee joint; he did not prescribe a leg brace. He never saw Belth thereafter and could not say what improvement had occurred; he expected some improvement in the muscle tone and atrophy, but indicated the diminution

in disability could not be substantial. The doctor conceded he had little experience in estimating percentages of disability for workmen's compensation purposes.

In his findings the Judge of Compensation indicated he did not attach much probative value to the doctor's estimate of post-1956 loss of the leg at 65%. He did not find it necessary to determine the extent of that disability, *i. e.* pre-October 22, 1958, in terms of percentage, because in his view the law required imposition of the compensation liability for the overall disability (except for the portion attributable to the Thul employment) on Ferrante whose employment produced the two October 1958 accidents. We agree the evidence would not support a finding that the pre-October 1958 disability was 65% loss of the leg. Aside from the fact that Dr. Borow obviously expected some improvement from further treatment and use of the leg after he last saw Belth, a conclusion that considerable improvement did occur is inescapable. To illustrate, Dr. Borow said there was almost complete loss of motion in the left knee joint in 1956. One of the medical witnesses who examined Belth in 1959, 1960 and 1961, the last time being after the Thul accident, said that flexion at the knee joint was possible to a right angle and extension of the leg was normal. Moreover, according to petitioner's testimony, prior to the 1958 injuries although he had a limp he had no difficulty in working as a dump truck driver. Under the circumstances, if it were necessary to do so, we would fix the pre-October 1958 disability at considerably less than 65% of the leg. For reasons to be stated, however, we agree with the Compensation Judge that disposition of the case does not require such a determination.

In the Compensation Division the permanent incapacity of the leg from all causes was fixed at 85%. Ten percent was charged to the Thul accident, the remaining 75% assessed in full against Ferrante. On appeal to the County Court the judge modified the judgment. He concurred in the finding of 85% loss of petitioner's left leg, and approved the allocation of 10% thereof against Thul. But he found that prior to the

two 1958 Ferrante mishaps Belth had a 65% permanent loss of the leg due to the noncompensable motorcycle accident. Being of the opinion that liability could not be imposed for the disability Belth brought with him to the Ferrante employment, he deducted the 65%, and reduced the compensation award against Ferrante to benefits based on 10% loss of the leg.

On further appeal the Appellate Division reversed the County Court and reinstated the Division award in full. That court held that since whatever leg impairment Belth had on entering the Ferrante employment came from a previous noncompensable accident, the total incapacity as aggravated or increased by the 1958 compensable accidents must be charged against Ferrante. No one questioned the 10% award against Thul and it was not disturbed by the Appellate Division; nor is it attacked in this Court.

The single question presented for determination is whether the unquestioned leg impairment, whatever its extent expressed in terms of percentage of deviation from the normal, which Belth brought with him to the Ferrante employment, should be deducted from the over-all percentage of disability which existed after the two October 1958 accidents.

██ ██ Over the years certain pertinent general principles have grown into firm acceptance in the administration of the Workmen's Compensation Act. When an employee is admitted to an employer's work force, he makes no warranty of physical or mental fitness, or freedom from latent or patent disability or disease. The employer takes him as he is, handicapped by any physical impairments, whether or not observable, as well as to any underlying condition or unusual susceptibility or idiosyncrasy or quiescent disease, which when subjected to accidental work-connected injury may result in greater disability than would follow if such impaired physical condition or weakness were not present. In such cases if a compensable injury acting on the already existing impairment or condition or disease produces greater disability than might ordinarily flow therefrom, it has been held uniformly

that the award of workmen's compensation must equal the full extent of the impairment. See, *Granowitz v. Hay Foundry & Iron Works,* 9 *N. J. Misc.* 1165, 157 *A.* 130 (*Sup. Ct.* 1931), affirmed 109 *N. J. L.* 394 (*E. & A.* 1932), back strain causing recrudescence of tuberculosis of spine; *Furferi v. Pennsylvania R. R. Co.,* 117 *N. J. L.* 508 (*E. & A.* 1936), death caused by work strain of long existing inguinal hernia; *McCadden v. West End B. & L. Assn.,* 126 *N. J. L.* 1 (*Sup. Ct.* 1940), affirmed 127 *N. J. L.* 245 (*E. & A.* 1941), accidental injury 27 or 28 years earlier caused substantial loss of vision in left eye; second accident aggravated the condition and caused enucleation of that eye; award for loss of an eye; *Molnar v. American Smelting & Refining Co.,* 127 *N. J. L.* 118 (*Sup. Ct.* 1941), affirmed, 128 *N. J. L.* 11 (*E. & A.* 1942), death caused by work strain of a previously diseased heart; *Marshall v. C. F. Mueller Co.,* 135 *N. J. L.* 75 (*Sup. Ct.* 1946), ribs fractured in fall at home; month later additional rib fractures in work accident reactivating dormant tuberculosis resulting in total permanent disability; *Davenport v. Alvord Hotel,* 21 *N. J. Super.* 493 (*Cty. Ct.* 1951), pre-existing hypertension, some loss of hearing and congenital curvature of spine. Fall caused brain concussion, back injury and shock; total disability followed; held fully compensable against employer; *Walsh v. Kotler,* 43 *N. J. Super.* 139 (*Cty. Ct.* 1956), affirmed, 46 *N. J. Super.* 206 (*App. Div.* 1957), aggravation of a pre-existing disability of the hands caused by dupuytrens contracture.

█ The benefits of the act have never been limited to those who were free from previous impairment. Where a work connected accident is a contributing cause of the ensuing disability, compensation is recoverable even though the disability would not have resulted or would not have been so great if the workman had been whole and well, or if he had not been handicapped already by some physical impairment. *Vandenberg v. John DeKuyper & Son,* 5 *N. J. Super.* 440 (*App. Div.* 1949) ; *Molnar v. American Smelting & Refining Co., supra; Ducasse v. Walworth Manufacturing Co.,* 1 *N. J. Super.* 77,

82 (*App. Div.* 1948). That this broad view continues to be current is demonstrated by *Nelson v. Meeker Foundry Co.,* 30 *N. J.* 139, 146–147 (1959), which declared it to be "settled in this State that the percentage of permanent disability suffered is not decreased by the fact that the physical member affected was not functioning to 100% of its capacity at the time of the accident." See also, *Dwyer v. Ford Motor Co.,* 36 *N. J.* 487 (1962). It is noteworthy also that in other states the same rule is applied in the absence of limiting language in the statute, or a provision for apportionment. 2 *Larson, Workmen's Compensation Law,* § 59.10, *pp.* 54–55 (1961); see *e. g. Young v. Dreamland Bedding Company,* 133 *So.* 2d 414 (*Fla. Sup. Ct.* 1961); *Tomes v. Gray & Dudley Company,* 201 *Tenn.* 697, 301 *S. W.* 2d 389 (*Sup. Ct.* 1957).

Defendant says that the reported cases where the employer has been held for the over-all partial permanent disability do not appear to involve pre-existing measurable orthopedic impairment. In large measure it seems to be true that liability for aggravation or reactivation of an already existing disease or bodily condition, or a greater degree of incapacity because of a predisposition to a more serious consequence from a traumatic injury, was presented for decision. But the principle of the extent of the employer's responsibility has always been expressed in the broad, general terms set forth above. No disposition can be discerned from the opinions to treat pre-existing orthopedic conditions differently from those of disease, quiescent or otherwise, or peculiar predisposition to greater consequences from injuries, in measuring entitlement to compensation benefits. For example, in *Walsh v. Kotler, supra,* it was plain the employee had some limitation of use of his hands from dupuytrens contracture before his compensable accident. Yet it was not suggested that there was any basis for a credit against the compensation liability for some percentage of impairment representing the pre-work connected disability. Also, in *Davenport v. Alvord Hotel, supra,* the employee had a congenital malformation or curvature of the

spine which imposed some restriction of motion. In a work connected accident she injured her back and other parts of her body, and became totally disabled. No deduction from compensation benefits was allowed for the congenital back condition.

In 1920 the total responsibility principle was applied in *Combination Rubber Mfg. Co. v. Obser*, 95 *N. J. L.* 43 (*Sup. Ct.* 1920). In that case Obser had lost one eye before entering respondent's employ. He suffered a work connected accident which caused loss of the other eye. He was allowed compensation benefits for total permanent disability, without deduction for the pre-existing lost eye. A few years later legislation, commonly called the One Percent Fund Act, *L.* 1923, *c.* 81, was adopted which undertook to ameliorate the employer's liability in cases where total permanent disability was produced by a combination of compensable accident and pre-existing partial permanent disability which had resulted from some other cause. No attempt need be made here to outline the subsequent legislative peregrinations which brought the One Percent Fund Act to its present form. It is sufficient to say in relation to this case that now if a person already suffering partial permanent disability from a noncompensable accident, sustains a work connected accident and becomes totally and permanently incapacitated from a combination of the two disabilities, he is entitled to compensation for the full disability. In this event, however, the employer's liability is limited to the portion of the incapacity produced by the employment accident and the balance is charged to the statutory fund. *N. J. S. A.* 34:15-95.

For many years it has been the policy of our State to promote the employment of workers who have some partial disability. *Accident Index Bureau v. Hughes*, 46 *N. J.* 160 (1965); *Richardson v. Essex National Trunk, etc. Co., Inc.*, 119 *N. J. L.* 47 (*E. & A.* 1937). The One Percent Fund Act is designed, among other things, to encourage the hiring of such persons, and to relieve the employers from the obvious hardship flowing from the requirement *in total permanent*

*disability cases* to pay for the portion of that disability result-
ing from an accident which is wholly unrelated to the employ-
ment. *Richardson v. Essex National Trunk, etc. Co., Inc.,*
*supra,* 119 *N. J. L.,* at *p.* 52.

■ Obviously adoption of the One Percent Fund Act was
a major step in the right direction. Thereafter when an em-
ployer responded to the plea and engaged a partially handi-
capped person, and such person suffered a work connected
accident which in combination with the pre-existing physical
impairment eventuated in permanent total disability, he re-
ceived compensation for the full measure of that disability.
In cases covered by the act, however, the employer was re-
lieved of the portion of the burden which was not chargeable
to the employment accident. See, *Balash v. Harper,* 3 *N. J.*
437 (1950) ; *Voessler v. Palm Fetchteler & Co.,* 120 *N. J. L.*
553 (*Sup. Ct.* 1938), affirmed 122 *N. J. L.* 434 (*E. & A.*
1939). But the act has definite limitations. It does not apply
where death results from the combined effect of an employ-
ment accident and a pre-existing partial disability. And, as
this Court recognized in *Nelson v. Meeker Foundry Co.,*
*supra,* when the employment accident leaves a greater *partial*
permanent disability than would be the case if the employee
had not brought a definite measurable impairment with him
to the employment, no provision is made under the One Per-
cent Fund Act or any other statute for a contribution repre-
senting the pre-existing portion of the disability. 30 *N. J.,* at
*p.* 144. Berkowitz in his work on *Workmen's Compensation*
(*Rutgers University Press,* 1960) 245, suggests that "with
the expanded coverage of compensation laws, this limitation
is difficult to justify."

Defendant suggests that to hold the employer responsible
for the over-all physical loss produced by the compensable
accidents in combination with petitioner's pre-existing ortho-
pedic disability, is not only unfair but may well have an ad-
verse effect in the future on opportunities for employment.
The argument is that such a legal principle is in conflict with
the State policy of persuading employers to hire partially dis-

abled persons. And we are asked to engraft a limiting quali-
fication on the general rule as it is now expressed. In this
connection, *Larson* recognizes a dilemma with two horns. He
says that apportionment of the over-all disability would result
in many cases in the employee's receiving far less monetary
benefit than his actual condition requires to prevent destitu-
tion and would probably put him on the relief roll. On the
other hand, the mandate for payment of benefits based on the
entire disability may cause loss of his job and curtailment of
future employment. *Larson, supra,* § 59.31.

◼ Our workmen's compensation system is of legislative
origin, dating back to 1911. *L.* 1911, *c.* 95. Over the ensuing
years the lawmakers have made many changes and improve-
ments in its structure, as adjustments stemming from experi-
ence have been considered necessary and advisable. In our
judgment, the problem of apportionment of an employer's
liability for payment of benefits in cases such as the present
one, in light of legislative history and administrative prece-
dent in the Division of Workmen's Compensation and in the
courts, ought to be left to the legislative branch of govern-
ment.[1] This view accords with the philosophy given voice by

---

[1] Larson and other students of the problem suggests the equitable
remedy is adoption of a so-called second injury fund. *Larson, supra,*
§ 59.31; *Berkowitz, supra, p.* 247; *United States Department of La-
bor, Second Injury Funds* (1957) 1–16. The Labor Department book-
let says:
   "Ideally, a second injury fund should pay the full difference be-
tween: (1) the amount the employer pays for the second injury, and
(2) the amount payable for the combined disability." at *p.* 19.
   In 1964, 46 states (including New Jersey), District of Columbia
and Puerto Rico had some form of second injury fund. Many of them
are not as limited as the New Jersey One Percent Fund. Twenty-one
do not require that the second injury when combined with the pre-
existing impairment result in total permanent disability. See, *United
States Department of Labor, Second Injury Funds* (1957) 1–16, 44–
60; *United States Chamber of Commerce, Analysis of Workmen's
Compensation Laws* (1964), 38–41.
   For examples of such funds in operation see: *Conway v. Aluminium
& Brass Company,* 304 *N. Y.* 571, 107 *N. E.* 2d 73 (*Ct. App.* 1952);
*Bechler v. Hecht's,* 283 *App. Div.* 901, 130 *N. Y. S.* 2d 26 (*App. Div.*

the Court of Errors and Appeals in *Richardson v. Essex National Trunk, etc. Co., Inc., supra,* after the adoption of the original One Percent Fund Act and the later enactment of an amendment thereof to cure a deficiency in its operation. There Justice Case said:

1954) ; *Sharer v. Hotel Corporation of America,* 144 *So.* 2d 813 (*Fla. Sup. Ct.* 1962).

It may be noted that there is presently pending in the Legislature a bill to amend the One Percent Fend Act to make it a true second injury fund, *i. e.* one which would apportion the liability for disability in certain cases arising out of a second accident between the employer and the fund. See *S* 29, introduced January 18, 1966, which provides in section 6 thereof:

"If any person who has a previous permanent disability incurs a subsequent compensable injury on or after January 1, 1967, resulting in a permanent disability regardless of type caused by both conditions that is materially or substantially greater than that which would have resulted from the subsequent injury alone, the employer or his insurance carrier shall in the first instance pay all awards for compensation and other benefits provided by chapter 15 of Title 34 of the Revised Statutes, but such employer or his insurance carrier shall be reimbursed from the fund established by section 34:15–94 of the Revised Statutes for all compensation payments, whether for temporary disability or permanent disability or both, in excess of 156 weeks of compensation, and for all payments of benefits under section 10 of P. L. 1956, c. 141 and section 34:15–15 of the Revised Statutes after the payment of the first $2,500.00 of such benefits."

Another broader amendment is pending in both Assembly and Senate. See *A* 1 and *S* 38, which provide in sections 30 and 31:

"30. Definition. As used in this act 'previous permanent disability' means any previous permanent disability, regardless of cause or type which is or is likely to be a hindrance or obstacle to employment.

31. If any person who has a previous permanent disability incurs a subsequent compensable injury on or after January 1, 1965, resulting in a permanent disability regardless of type caused by both conditions that is materially or substantially greater than that which would have resulted from the subsequent injury alone, the employer or his insurance carrier shall in the first instance pay all awards for compensation and other benefits provided by chapter 15 of title 34 of the Revised Statutes, but such employer or his insurance carrier shall be reimbursed from the fund established by section 34:15–94 of the Revised Statutes for all compensation payments, whether for temporary disability or permanent disability or both, in excess of the compensation which would have been payable as a result of the subsequent injury alone."

These same bills were introduced in 1963 and 1965, but apparently were not moved.

"It is only natural, in the practical administration of such a complex and relatively new state governmental function as the rehabilitation of injured persons, that unforeseen contingencies should arise from time to time. But we clearly discern in the act of 1936 a continued and progressive development of the law to meet unforeseen contingencies as they arise to the end that full force and effect be given to the objective sought to be accomplished by the state; namely, to make its plan of rehabilitating injured persons workable and a useful reality." 119 *N. J. L.*, at *pp.* 52–53.

It is apparent that the Legislature after being made aware of some aspects of the present problem, responded with a remedial measure.

In 1956 the following amendment to the act was adopted:

"If previous loss of function to the body, head, a member or an organ, *due to any previous compensable accident or accidents,* is established by competent evidence, and subsequently an injury arising out of and in the course of an employment occurs to that part of the body, head, member or organ, where there was a previous loss, then and in such case, the employer or his insurance carrier at the time of the subsequent injury *shall not be liable for any loss for which compensation has previously been paid or awarded.* In either event, credit shall be given the employer or his insurance carrier *to the extent of the previous loss for which compensation has been paid." L.* 1956 *c.* 141; *N. J. S. A.* 34:15–12d. (Emphasis added).

The statement appended to the bill at introduction said the provision allowing the employer or insurance carrier "credit for any payments made in connection with a previous compensable accident to the same part of body, head, member or organ is equitable." An inference to be drawn from the amendment and the statement is that the Legislature was neither suggesting nor authorizing apportionment of liability for over-all disability resulting from a combination of pre-existing impairment of a part of the workman's body and a later work connected injury to the same part, unless the earlier impairment came from a compensable accident and compensation was paid in fact for the earlier disability. It follows logically from such inference that in all other cases the Legislature intended the general rule of full responsibility for the over-all disability to continue in effect. If such was not the intention or if the specific problem presented

here was not brought to the lawmakers' attention, we assume the matter is open for consideration when the bills referred to in footnote 1 are moved.

In this case Belth's 1954 motorcycle accident did not arise out of and in the course of his employment. The Workmen's Compensation Act was not applicable and no such benefits were paid. Under all of the circumstances appearing in this record, therefore, apportionment of the full disability which followed the 1956 accidents with Ferrante cannot be ordered. Accordingly the judgment of the Appellate Division is affirmed.

*For affirmance* — Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO—6.