811 A.2d 510

FRANK CAPANO, PETITIONER–RESPONDENT,
v. BOUND BROOK RELIEF FIRE CO. # 4,
RESPONDENT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Submitted October 1, 2002—Decided December 17, 2002.

Before Judges STERN, COBURN and ALLEY.

*Convery, Convery & Shihar,* attorneys for appellant (*Bernard H. Shihar,* of counsel and on the brief).

*Vogel & Gast,* attorneys for respondent (*Theodore E. Gast,* of counsel and on the brief).

The opinion of the court was delivered by

STERN, P.J.A.D.

Respondent Bound Brook Relief Fire Company appeals from an award of workers' compensation benefits to petitioner, Frank Capano, as a result of an accident on February 19, 1994. The benefits included $2,431.41 for "temporary disability" and $115,722.86 for "permanent disability" for a total of 251 4/7 weeks from the time of the accident to the time of petitioner's death in

January of 1999. Although not without difficulty given the nature of the services petitioner performed for respondent volunteer fire company and the nature of his relationship with the squad, we conclude that the controlling statute and our scope of review mandate affirmance of the judgment.

## I.

Petitioner, age 93 at the time of the accident in question, became a volunteer fireman for the Borough of Bound Brook when he turned eighteen in 1918. He served as chief of the fire company twice, in 1939 and in 1959. He also founded the Borough's rescue squad in the mid–1930's.

By 1994, petitioner no longer attended drills nor responded to the scene of a fire, but he spent considerable time at the firehouse. He would typically arrive at the firehouse early each evening, clean up a little, and then "watch TV and talk with the other members."

In 1994, David Dombey was respondent's president. Dombey testified that petitioner was a "life member" of the company, which meant that he had been an active member for more than twenty-five years. "Out of honor for his years of service, . . . by far the longest standing member of the fire company," respondent kept petitioner's name on the "roster" of active firemen, although petitioner's purpose in going to the firehouse was essentially "social." Fire Chief David Czarcinki also testified that no duties were assigned to petitioner. On the other hand, there was testimony that petitioner helped clean up, mop floors, clean the bathroom and "[took] care" of the wood burning stove used to supplement the heat in the firehouse.

At around 10:00 p.m. on February 19, 1994, petitioner's granddaughter arrived at the firehouse. She and her husband, Bruce Gorski, the company's first lieutenant, found petitioner on the floor next to a table in the back room. Bruce Gorski estimated that the table was about 11½ feet from the wood burning stove which was located on a raised platform. Petitioner was taken by

ambulance to the emergency room at Somerset Medical Center. His son, Patrick, testified that his father told him, while at the emergency room, that he fell while "putting a log on the wood burning stove" and "stepped off the ledge" of the platform surrounding the stove. Fran Grabowski, petitioner's daughter, also testified that, while at the emergency room, petitioner told her that he got up to put a "log on the wood burning stove" and clean around the stove, but "slipped and fell on the waxed floor."[1]

Petitioner had fractured his hip during the fall and had to undergo partial hip replacement surgery. Before the surgery, he had been living with his daughter, but after the surgery he moved to a nursing home.

According to petitioner's expert, Dr. Earl C. Shaw, the fall resulted in a total permanent orthopedic disability. Dr. Shaw opined that nursing home care was necessary, and he believed that respondent "had lost the ability to perform [his normal] acts of daily living."

Respondent's expert, Dr. Francis DeLuca, also diagnosed respondent with a fractured hip, but estimated petitioner's loss due to the hip fracture at 10% of partial total. Dr. DeLuca concluded that the surgery to repair the hip was successful and attributed the balance of petitioner's condition to the normal "aging process."

## II.

██ We find no abuse of discretion by the admission of petitioner's statements to his children regarding what he was doing when he fell. *See Cestero v. Ferrara,* 57 *N.J.* 497, 503–504, 273 *A.*2d 761 (1971); *Truchan v. Sayreville Bar & Restaurant,* 323 *N.J.Super.* 40, 48–50, 731 *A.*2d 1218 (App.Div.1999). In any event, there was independent evidence to sustain the finding that he was attending the fire when he fell. Petitioner stated in his deposition, which

---

[1] While the admissibility of these statements is challenged, there is no express contention addressed to the lack of a hearing or statement of reasons to support the finding of trustworthiness which flows from the proximity of events.

was admitted into evidence, that he fell due to an "elevation." Bruce Gorski, one of the witnesses who found petitioner on the night of the accident, testified that the wood burning stove is "elevated maybe 14 inches on a brick base." He further testified that the stove sits "set back," about a foot and a half, on the raised platform and that the wood for the stove was kept on a rack next to the stove.

Gorski also testified that he found petitioner "lying on the floor on the far side of the table," which he estimated to be "approximately 11 and a half feet from the stove." Gorski marked the location by placing an "X" on the picture. Petitioner's granddaughter, Lisa Gorski, also drew a diagram showing where petitioner was found.

Based on this evidence, the judge of compensation found that it was "obvious that the Petitioner was much closer to the stove [than] he was to the television located in an opposite corner." Accordingly, the record supports the finding that petitioner had been maintaining the fire incident to his fall.

### III.

N.J.S.A. 34:15–43 provides workers' compensation coverage to "each and every member of a volunteer fire company doing public fire duty ... who may be injured in line of duty." As used in this section, "doing public fire duty" and "injured in line of duty" include "participation in any authorized construction, installation, alteration, *maintenance* or repair work upon the premises, apparatus or other equipment owned or used by the fire company ..." (emphasis added.)

The judge of compensation concluded:

that because Frank Capano had a key to the firehouse, a pager to receive fire calls and was in almost daily attendance at the firehouse tending a wood burning stove which was the primary heating source for that firehouse, that Capano was "doing public fire duty" by maintenance of the firehouse premises.

Respondent contends and its witnesses testified that no one in authority ordered Capano to perform any duties of maintenance. The line and corporate officers of Bound Brook Relief Fire Company # 4 provided the key, the pager, and knew the

wood burning stove had to be stoked. While it may be true that no direct order was ever given to Capano to perform the maintenance functions he undertook, which also included "cleaning up" the firehouse, their acquiescence in his activity and the benefit conferred upon the fire company by his activity brings Capano within the protection of the provisions of *N.J.S.A.* 34:15–43.

Respondent contends that because the testimony showed that petitioner was ten to twelve feet from the wood burning stove when he fell, it is more likely that petitioner was watching television than tending the stove. Factually there is no basis for this contention. The exhibits in evidence show that petitioner was much closer to the stove than the television when he was found by his granddaughter.

Respondent raises as a defense an ordinance of the Borough of Bound Brook that establishes criteria for membership in a fire company. This ordinance includes among other requirements that a volunteer fireman over the age 65 must obtain a doctor's certificate that he is physically capable of performing the functions of a volunteer fireman. Respondent would have us apply this ordinance to deny Frank Capano his workers' compensation benefits. However, there is no evidence that this provision has ever been complied with or enforced as to any Bound Brook fireman. To apply this ordinance for the purpose of denying compensation benefits to this injured volunteer fireman would do an inequity.

Respondent introduced in evidence several rosters produced by the borough clerk entitled "Active Fireman's Membership Report" that did not include Frank Capano's name. These rosters did not include[] very many names at all. For the year 1997 the list included four names—in 1996 six names—in 1995 eight names—in 1994 fourteen names or 16 names. No list was produced for 1993. According to the clerk these lists are provided to him by the State of New Jersey and he knows nothing about the reason for or method of preparation. A review of *N.J.S.A.* 40A:14–56, *Exempt Fireman Certificate of Eligibility* sets forth the criteria required to qualify as an exempt fireman, seven years of membership attending at least 60% of fire duty in each year, good moral character, citizen of the United States, resident of the municipality, and being between the age[s] of 18 and 40 when membership commenced. *N.J.S.A.* 40A:14–57, *Verified List of Non–Exempt Members* requires the filing of a list of non-exempt fireman with the municipal clerk. The lists marked in evidence are lists required by this statute. Since the petitioner was qualified as "exempt" many years before the preparation of the lists in evidence[,] his name would not be included therein.

For the reasons set forth above I find and determine that Frank Capano was "doing public fire duty" at the time he suffered his accident on February 19, 1994. Therefore the Borough of Bound Brook is responsible for workers' compensation benefits as provided by statute.

We find no basis for disturbing this fact-finding which includes an assessment of the credibility of the relatives who found petitioner in proximity to the wood burning stove and heard his nearly contemporaneous explanation of the event, before there was any opportunity to fabricate. *See Close v. Kordulak Bros.*, 44 *N.J.*

589, 210 *A*.2d 753 (1965). *See also Vogt v. Borough of Belmar,* 14 *N.J.* 195, 101 *A*.2d 849 (1954), finding an estoppel preventing reliance on a municipal ordinance relating to the age requirements for membership.

Respondent claims that petitioner's disabilities were attributable to his age. It argues that petitioner suffered from many conditions unrelated to his fall, and its expert attributed only a 10% partial total disability to that event.

*N.J.S.A.* 34:15–31(b) provides that there shall be no compensation awarded for conditions "due to the natural aging process." *See also Fiore v. Consolidated Freightways,* 140 *N.J.* 452, 469, 659 *A*.2d 436 (1995). However, *N.J.S.A.* 34:15–12(d) imposes upon respondent the "burden of proof" of establishing by competent evidence that petitioner had a pre-existing loss of function. Here, the judge of compensation quoted *N.J.S.A.* 34:15–12(d) and specifically concluded that:

> The respondent presented no proof of the pre-existing functional loss of the petitioner due to the aging process or any other infirmities. Therefore I must find that respondent is not entitled to a functional loss credit.

With regard to damages, the judge of compensation found:

> At the time of his injury the petitioner was 93 years old. He lived with his daughter and occupied a bedroom on the second floor. He spent his time on many days walking to the barber shop of his nephew where he would spend several hours talking to friends and customers. He would return home and prepare a meal for himself. Afterwards he would clean up the kitchen. He took care of his personal needs. In the evenings he would be in attendance at the firehouse undertaking activities described in my decision finding liability of the fire company. Although he no longer drove a car he would do his own grocery shopping and carried his own packages into his home. Unfortunately, petitioner never returned to these ordinary activities after fracturing his hip. He spent the remainder of his life in a nursing home.
>
> No evidence was presented to assist the determination of the period of temporary disability. While the records of Somerset Medical Center for the admission following the accident are in evidence all we know is that Mr. Capano underwent a hemiarthoplasty of the left hip. He continued to have physical therapy at the Raritan Health and Extended Care Center. There is no showing of when Mr. Capano reached maximum medical recovery from that surgery. Since the only information available to fix the period of temporary disability is the hospital admission I find that petitioner was temporarily totally disabled from the date of

admission to Somerset Medical Center on February 20, 1994 to his discharge on March 29, 1994, a period of five and 2/7 weeks.

Concerning the issue of the nature and extent of permanent disability there is little disagreement about the functional loss of this petitioner. He was a functioning 93 year old, able to go on daily walks, cook for himself, take care of his own needs, and to contribute his volunteer services to Bound Brook Relief Fire Company # 4. Following this accident he became an invalid only able to walk a few feet with the assistance of a walker, basically wheelchair bound, unable to even take care of his personal needs.

. . . .

Petitioner's expert, Earl C. Shaw, M.D., delivers the opinion that Mr. Capano is totally disabled because of his inability to even transfer from his wheelchair to an examining table, because of the restriction of motion in the left hip, and the inability of Mr. Capano to carry on the activities of daily living. Except for finding less restriction of motion of petitioner's left hip, respondent's orthopedic expert, Francis De Luca, M.D., described Mr. Capano in much the same way as Dr. Shaw. However, Dr. De Luca only estimated disability "in the hip", stating that disability to be 10% of the partial total. He specifically testified that he was not estimating disability of the entire body. It is respondent's contention that it should only be responsible for that disability and not be charged with the result of the "aging process" suffered by Mr. Capano. Mr. Capano became permanently and totally disable[d] as the result of the fall and the fractured hip. Mr. Capano, at 93 years of age, was how respondent "found" him. It is well settled that an employer, here at the fire company, takes an employee as he is, subject to all the weaknesses and infirmities he posses, even though they render the individual more susceptible to injury. *Bober v. Independent Plating Corporation*, 28 *N.J.* 160, 164, 145 *A.2d* 463 (1958). *Belth v. Ferrante & Son, Inc.*, 47 *N.J.* 38, 45–46, 219 *A.2d* 168 (1966). . . .

In this setting, we must defer to the judge of compensation's conclusion. *Close v. Kordulak, supra,* 44 *N.J.* at 598, 210 *A.2d* 753.

As already noted, *N.J.S.A.* 34:15–43 provides for workers' compensation benefits for "each and every member of a volunteer fire company doing public fire duty and also each and every active volunteer, first aid or rescue squad worker ... who may be injured in line of duty...." We have considered, at length, the significance of the words "in line of duty." The statute specifically further provides:

As used in this section, the term 'doing public fire duty' and 'who may be injured in the line of duty,' as applied to members of volunteer fire companies ... shall be deemed to include participation in any authorized construction, installation, alteration, *maintenance* or repair work upon the premises, apparatus or other equipment owned or used by the fire company .... (emphasis added.)

We have examined the legislative history and find no basis for concluding that stoking or maintaining a fire to keep the fire house warm or cleaning the firehouse is not "maintenance" of the premises. Therefore, petitioner must be said to have been "doing public fire duty" at the time of his accident. Moreover, while the statute refers to "active volunteer, first aid or rescue squad workers" and "authorized" workers of volunteer fire companies who are not members "of the volunteer fire company within which the first aid or rescue squad may have been created," there is no such limitation regarding workers' compensation benefits with respect to "each and every member of a volunteer fire company doing public fire duty." Moreover, *N.J.S.A.* 34:15–43 further provides:

> As used in this section and in R.S. 34:15–74, the term "authorized worker" shall mean and include, in addition to an active volunteer fireman and an active volunteer first aid or rescue squad worker, *any person performing any public fire duty* or public first aid or rescue squad duty, as the same as defined in this section, at the request of the chief or acting chief of a fire company or the president or person in charge of a first aid or rescue squad for the time being. (emphasis added.)

While petitioner may have been given no direct fire fighting duties or assignments, we cannot on this record disturb the trial judge's determination that petitioner, as a member of the volunteer fire department, was performing a "public fire duty" by virtue of his "maintenance" of the firehouse. Stated differently, our scope of review precludes reversal. We nevertheless commend this matter to the attention of the Legislature because we have reservations about the intent of the scope of the statute, although we can find no legislative history to support any relevant limitation. Moreover, a municipality which maintains a voluntary fire company can limit its liability by making sure statutory requirements and ordinances are adhered to and that the membership rosters include all appropriate names but not persons who retain only a social relationship with the squad.

There is no dispute regarding the amount of benefits awarded if the accident is compensable, and the respondent's additional argu-

ments do not warrant discussion in this written opinion. *R.* 2:11–3(e)(1)(D),(E).

The judgment of the Division of Workers' Compensation is affirmed.