637 A.2d 578

JOHN FIORE, PETITIONER–APPELLEE, v. CONSOLIDATED FREIGHTWAYS, INC., RESPONDENT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued January 12, 1994—Decided February 22, 1994.

Before Judges SHEBELL, LONG and LANDAU.

*Joseph M. Soriano* argued the cause for respondent (*Mattson, Madden & Polito*, attorneys; *Mr. Soriano*, of counsel and on the brief).

*Michael J. Dillon* argued the cause for petitioner (*Krumholz, Horn, Schechtman & Hirsch*, attorneys; *Mr. Dillon*, on the brief).

The opinion of the court was delivered by

SHEBELL, P.J.A.D.

In this appeal by an employer from an award of Workers' Compensation benefits, we are called upon to determine whether and to what extent the New Jersey's Workers' Compensation Act (*N.J.S.A.* 34:15–1 to 128) permits an award of benefits to an employee for cardiovascular disease caused by an occupational exposure, in the absence of specific work effort or strain which causes an acute heart attack or other cardiovascular injury. This issue is compounded by the question of the applicability of *N.J.S.A.* 34:15–7.2 which requires that "[i]n any claim for compensation for injury or death from cardiovascular or cerebral vascular causes, the claimant shall prove ... [that the causative] work effort or strain ... [was] in excess of the wear and tear of the claimant's daily living...." In the event such an occupational exposure-related cardiovascular disease is compensable, we must then determine whether the Workers' Compensation judge properly found that petitioner proved all of the necessary elements of such an occupational exposure claim.

On May 4, 1987, petitioner, John Fiore (petitioner), filed Claim Petition 87–13929 with the Division of Workers' Compensation. He alleged that an occupational exposure "to deleterious substances" while working as a truck driver for respondent, Consolidated Freightways, Inc. (respondent), from 1966 to the time of filing, resulted in neurological and neuropsychiatric injury, as well as "Pulmonary–Internal, Lungs and Heart" injuries. Petitioner had previously, on October 20, 1986, filed Claim Petition 86–31585 alleging that he had suffered a heart attack while on the job with respondent on August 8, 1986. Petitioner claimed neurological, neuropsychiatric, and heart injury from this incident.

The seven days of trial on these consolidated claim petitions spanned more than two years, from September 18, 1989, to October 17, 1991. The judge's final decision was not rendered until a year thereafter on October 8, 1992.[1] On May 7, 1990, Claim Petition 86–31585, which alleged that petitioner had suffered a heart attack while on the job, was dismissed by the judge for "failure to sustain burden of proof ... as to any specific incident." The judge also dismissed petitioner's claim for pulmonary disability, under Claim Petition 87–13929, on the basis that petitioner's expert classified the pulmonary functional disability as "mild." *See N.J.S.A.* 34:15–36.

Respondent appeals the Workers' Compensation judge's award to petitioner of thirty-three and one-third percent of partial-total permanent disability for angina and coronary artery disease caused by occupational exposure to carbon monoxide. This computed to 200 weeks of compensation at the rate of $133 per week for a total sum of $26,000. Respondent was also ordered to pay a State disability lien of $4,074.37, a Teamster Union lien of $7,483.66, and medical bills of $6,469.37.

---

[1] Interestingly, the judge of compensation had noted at the conclusion of the December 11, 1989 hearing: "the Workers' Compensation Court has been criticized for taking as long as we do to try the case. I'm not agreeing with the nature of that criticism, but I will do everything I can to move this case along."

Petitioner, thirty-nine years of age at the time his claim petitions were filed, was the only lay witness to testify at trial. He testified that he was employed by respondent starting in June 1967, as a dock worker. His job duties consisted of moving freight at the terminal, as well as from truck to truck. During the first year, petitioner performed his duties at respondent's Port Newark terminal, after which the business moved to Paterson. Petitioner continued his job as dock worker at this location for approximately three years.

Petitioner characterized the conditions in the Paterson plant as "terrible." He explained "[i]t was very old and dingy. You know, bad lighting, terrible floor, all kinds of dust and fumes and everything over there." The dust came from the freight and the fumes were allegedly caused by the trucks that were kept running from 5:00 or 6:00 a.m. to when the drivers came in at 8:00 a.m. Petitioner noted it was a "very small and old" facility with "about ten" trucks that would be started up in the morning. He also added that there were "trucks only on one side" of the terminal and ten to fifteen doors for trucks to pull in. Petitioner testified that he worked the night shifts which would be "[e]ither from 6:00 at night until 3:00 in the morning or midnight until 9:00 in the morning" with occasional overtime. Even though it would appear that only the later shift would have exposed petitioner to truck fumes, the record is not specific as to when or for how long he worked either shift.

In January 1969, petitioner became a truck driver for respondent and was still employed in that position at the time of trial. He never went back to dock or platform work. The respondent's business moved from Paterson to Wayne at about the same time petitioner became a truck driver. Petitioner had been reporting to the Wayne location for the twenty years prior to trial.

Petitioner testified at trial on September 18, 1989, that "since last January" (1989), his job duties consisted of starting the

twenty-five trucks each morning which would take about an hour.[2] He then makes various pick-ups and deliveries throughout the day. Petitioner had been required as a truck driver to sweep out his truck each day when it got empty. Since his hospitalization in August 1986, he has performed this task as infrequently as possible, perhaps once a week. The trucks that petitioner has driven have been diesel engine tractor-trailers, with the exception of about three years, between 1980 to 1983, when propane engines were used.

Petitioner also described the air quality at the off-site warehouses where he made deliveries and pick-ups as dusty and full of fumes from the trucks. He would, however, attempt to avoid these conditions. Petitioner estimated that he spent approximately three hours out of a twelve-hour workday driving his truck. He stated that he hasn't been able to detect any fumes inside his current cab and described the air quality in this cab for the past two years as "okay." Prior to his present cab, petitioner claimed that the air quality of the older trucks that he drove was "pretty bad." He claimed that in the winter the fumes came in while he was driving these older trucks because "everything starts loosening up." Petitioner added that he had put in complaints regarding the older trucks because they would be drafty and fumes would get into the cab. He noticed no problems with fumes in the summer when the cab windows were open.

On August 8, 1986, petitioner was performing his usual duties which involved what he called a "pedal run." A "pedal run" is a delivery and pick-up route that consists of ten or twelve "stops" in a certain area. He described the day as "very hot" with the temperature "in the nineties." Immediately before lunch, petitioner went to A.F.I. in Roseland. Prior to his stop at A.F.I.,

---

[2] Petitioner's hypothetical question to his medical experts incorrectly listed this alleged exposure as commencing in "January 1988." In any event, this recent exposure could not be relevant as a causative factor in petitioner's disabilities as he alleged these claims manifested themselves in 1986. He did not have this duty prior to his heart episode of August 1986.

petitioner had made about four or five "stops." He delivered four or five "skids" or "pallets" containing loose food products of all different sizes to A.F.I. A.F.I. wanted everything "segregated," meaning the "red ones on one pallet and all the green ones on another pallet." Petitioner estimated that he was at A.F.I. for approximately two or three hours separating the cartons. In the course of these duties he began to feel "discomfort and pain." He estimated that there were a couple of hundred bundles to unload at A.F.I., with the heaviest being between forty and one hundred pounds.

No one assisted petitioner in these duties and he had to rest a few times during the course of the unloading because of discomfort on both sides of his upper chest. He started sweating and claimed "it wasn't a normal sweat." He testified that the discomfort began approximately an hour before he had finished at A.F.I. During this hour, he drank water, rested, and went slower with the unloading. When the unloading and separating was completed, he left A.F.I. and finished the rest of his route. Petitioner left work at 6 p.m. He felt "[v]ery fatigued and like drawn out." He mentioned to the supervisor when he was leaving work that he "didn't feel good that day."

He went home and told his wife that he didn't feel well. He and his wife went to Caldwell Quick Med, where the doctor gave him an EKG. The doctor advised petitioner to go to the hospital. Petitioner, again accompanied by his wife, went directly to St. Barnabas Hospital where he gave a history of being under stress at work and having chest pressure for two or three days. He was admitted for eight days, three of which were in intensive care. While there, he underwent a series of tests including a heart catheterization. His diagnosis on discharge was "occlusive coronary artery disease with mild impairment in left ventricular function."

After discharge, petitioner stayed home for approximately four or five months before returning to work. He remained under the care of a heart specialist and continued to see him for check-ups

every three months. Petitioner was prescribed one aspirin, two Lopressors, and one Isordil each day. No treating physician was produced at trial.

Petitioner's primary complaint at trial was shortness of breath. Before his hospitalization, he could walk six or seven blocks, but after his hospitalization, walks only one block before he gets short of breath. Further, petitioner testified that he used to play racquetball three times a week, but can no longer play at all. Petitioner also testified that he no longer cuts the lawn or paints the house because these activities are too strenuous.

Petitioner was again hospitalized in February 1988, when he felt "spasms" in his chest. Petitioner was released after three days. Following his release, petitioner took two weeks of vacation time at home.

Petitioner's attorney concluded his direct examination of petitioner by stating he had "no further questions at this point." Over the objection of respondent's attorney, the judge called for a five minute recess and instructed petitioner's attorney that "our case law under *Hellwig*[3] requires that the petitioner show that his work effort at work obviously was greater than his work effort at home. You have not done that.... We will take ten minutes and I will give you an opportunity to speak to the petitioner."

After the recess, petitioner's attorney resumed direct examination of petitioner, but the judge interrupted and explained to the petitioner that he wanted a comparison of petitioner's work effort at home to his work effort on the job. Then, over respondent's objection, the judge took over the questioning of petitioner, inquiring about petitioner's various activities at home and at work. Petitioner answered that prior to his hospitalization, his activities at home included taking care of his lawn, painting the house, and playing racquetball. Petitioner stated that his work effort on the

---

[3] *Hellwig v. J.F. Rast & Co., Inc.*, 110 N.J. 37, 538 A.2d 1243 (1988).

job was "probably" more arduous and strenuous than his activities at home.

On cross-examination, petitioner admitted that prior to August 8, 1986, he had smoked two packs of cigarettes per day for twenty years. He also revealed that his father died of a heart attack at age 59. Further, petitioner reported that he was overweight, weighing approximately 240 to 250 pounds on August 8, 1986, and that he still weighed about the same.

Petitioner offered the testimony of Dr. Henry Velez, a board-certified physician in internal and pulmonary medicine. Dr. Velez examined petitioner on one occasion, June 5, 1987, and reviewed petitioner's records from St. Barnabas Hospital. His examination included a chest x-ray, an electrocardiogram, and a pulmonary function test.

Dr. Velez characterized the pulmonary function tests as normal. His interpretation of the x-ray was that petitioner "demonstrated peribronchial fibrosis on the chest film." He concluded that petitioner's degree of pulmonary disability was seventeen and one-half percent. This the doctor classified as "mild."

Regarding petitioner's cardiac condition, Dr. Velez testified that petitioner "was suffering from coronary artery disease, the clinical manifestation of angina, experiencing chest pain and shortness of breath." He estimated petitioner's cardiac disability at thirty-five percent of total.

A hypothetical question was placed in evidence by petitioner's attorney without objection. Based on the hypothetical question, petitioner's hospital records, and his own examination, Dr. Velez rendered an opinion that petitioner's cardiac disability was caused by "chronic exposure" to carbon monoxide while at Consolidated Freightways, and not a specific incident.

Dr. Velez stated that his reasons for this conclusion were:

There's been exposure to carbon monoxide, a longtime exposure to carbon monoxide. With exposure to carbon monoxide, it's been well-studied and well-documented that there is increased permeability of the membranes of the coronary arteries, of arteries in general, but the coronary arteries have been most studied.

There is increased permeability to lipids or to cholesterol. With that increase of permeability there's a laying-down of cholesterol, crystal plaques within the—within the endothelium or the inner lining of the coronary artery.

In addition, besides increasing permeability by the actual process of atherogenesis of the crystals coming together and forming a plaque is enhanced by carbon monoxide.

. . . .

When you arrive at a critical level, or critical stenosis—meaning a critical narrowing of the pulmonary arteries—the coronary arteries—one of two things can occur. One can be angina, chest pain—which with exertion, or you can have a myocardial infarction with all its attendant complications, such as sudden death.

Dr. Velez noted that the narrowing of the pulmonary and coronary arteries is known "to start early in life" and takes approximately fifteen or twenty years, depending on the level of exposure. He asserted that strenuous work performed in an area with carbon monoxide or toxic elements increases the exposure because a person would breathe in more and, therefore, the narrowing process would also increase. He supported his conclusions by referring to studies regarding the effects of exposure to carbon monoxide on the coronary arteries.

Dr. Velez acknowledged that one of the known toxins in cigarette smoke is carbon monoxide and that the labeling on cigarette packages specifically refers to the presence of carbon monoxide in cigarette smoke. The doctor was not able to quantify the effects of carbon monoxide from cigarette smoking as opposed to the carbon monoxide from the job. The following direct examination is pertinent:

Q. Now Doctor, in the hypothetical question there is a history of smoking. Could you tell us what effect, if any, that has on your opinion?

A. Well, one of the known toxins of smoke, cigarette smoke, is carbon monoxide, so it has a similar effect.

Q. Is there any way that you can break down the effects that the cigarette smoking had as opposed to the effects that the carbon monoxide on the job had?

A. *It's the same, it's the same agent, and it's difficult to quantify which—you know, it's difficult to quantify which was more and which was less.* [Emphasis added.]

In response to an inquiry by the judge, Dr. Velez agreed that petitioner's smoking of two packs per day for twenty years was

"certainly contributory to his overall disability." However, the doctor continued to maintain that petitioner's coronary disease and his "exposures to carbon monoxide through his work environment were materially related." He conceded that it "would be impossible" to break down percentage-wise which constituted more.

On cross-examination, Dr. Velez agreed that the levels of carbon monoxide in the blood can be determined by a simple blood test. However, he did not conduct any such tests on petitioner and he did not know if any had been done. Dr. Velez also agreed that not everyone who works in the trucking industry gets coronary artery disease. Dr. Velez stated that persons who smoke two to three packs of cigarettes per day have been shown by tests to have carboxyhemoglobin levels of ten percent. He stated that the level of ten percent has also been found in those individuals who work in tunnels where there is exposure to carbon monoxide. Without documentation, he opined that the exposure to carbon monoxide when starting up trucks or when driving poorly maintained trucks was "much greater than already known and documented exposures to cigarette smoke." He did, however, concede that no air studies were performed at petitioner's workplace and that the studies in the field were general studies.

The compensation judge elicited testimony from Dr. Velez that petitioner's risk factors for coronary artery disease were the following: 1) being a male; 2) his history of cigarette smoking; 3) his father's death at age fifty-nine from cardiac disease; and 4) being overweight by fifty or sixty pounds. Upon re-direct, Dr. Velez testified that an individual with these risk factors would be more likely to sustain coronary artery disease. He then added that an individual with these risk factors would have a greater risk of sustaining coronary artery disease when exposed to carbon monoxide.

Respondent presented the testimony of Dr. Sanford Lewis, an internist. Dr. Lewis examined petitioner on two occasions—June 1, 1987, and September 15, 1988. On each occasion, Dr. Lewis took a chest x-ray. He found petitioner's heart and lungs were

normal, but the aorta "was somewhat accentuated." Petitioner was also given an EKG during each examination. Dr. Lewis testified that the tracing was "not diagnostic of previous inferior wall myocardial infarction." Upon the physical examination, Dr. Lewis found petitioner's heart and lungs to be clear. He testified that petitioner was "quite obese" with a weight of 253 and height of 70 inches. At trial, Dr. Lewis examined petitioner's EKG results from the August 8, 1986 St. Barnabas Hospital admission. Dr. Lewis found that petitioner's heart had not been damaged and that petitioner did not have a myocardial infarction.

Dr. Lewis concluded that petitioner's cardiac disability was fifteen percent of partial total. He concluded, however, that petitioner's disability was based on coronary artery disease and was not work-related. Dr. Lewis supported his testimony with an article entitled *Fire Fighting and Coronary Heart Disease* appearing in *Circulation,* Vol. 65, No. 5 (May 1982). This article discussed a study conducted at Harvard Medical School in which fire fighters were compared to non-fire fighters to determine if there was increased evidence of coronary disease. The comparison revealed no material difference and, therefore, the article concluded that fire fighters do not have an excess risk of coronary heart disease. Dr. Lewis also relied on an editorial entitled *Smoking and Coronary Artery Disease* appearing in the medical journal *Chest,* Vol. 94, No. 3, (Sept.1988), because it did not list carbon monoxide as a risk factor for heart disease, although it did recognize the direct and dynamic relationship of cigarette smoking to acute heart attacks and sudden death. This article suggested it was the smoke plus the nicotine in cigarettes, not the carbon monoxide, that precipitated heart attacks in smokers. On cross-examination, Dr. Lewis testified that there have been some papers suggesting a link between carbon monoxide and arteriosclerotic heart disease, but in his opinion, the connection was "uncertain."

Dr. Velez was recalled by petitioner to comment in rebuttal on the articles that had been submitted into evidence during the testimony of Dr. Lewis. Dr. Velez found those articles weak. He

asserted that the consensus data on heart disease and carbon monoxide "is clearly in the direction of a causal relationship between carbon monoxide and heart disease and clearly in those people known to be at risk, fire fighters, policemen, foundry workers, tunnel workers, et cetera, people who are exposed to carbon monoxide."

Dr. Velez produced two articles during his rebuttal testimony. One article, entitled *The Effects of Carbon Monoxide on Cardiovascular Disease,* had appeared in *Preventive Magazine,* Vol. 8 (1979). It was based on a 1978 workshop and discussed the acute and possible long-term effects of carbon monoxide from cigarette smoking and heavy occupational exposure on cardiovascular disease. According to Dr. Velez, the other article, entitled *Mortality in Police and Fire Fighters in New Jersey,* appearing in the *American Journal of Industrial Medicine,* Vol. 9 (1986), reported that fire fighters, who suffer more exposure to carbon monoxide in contrast to other individuals, have a higher degree of illness and death from coronary artery disease. On cross-examination, Dr. Velez agreed that there were no specific articles regarding coronary disease and the trucking industry. It was, however, his opinion that truck drivers and anyone exposed to exhaust are exposed to increased levels of carbon monoxide.

In entering judgment in favor of petitioner, for permanent disability from work related coronary artery disease, the judge declared:

> From the testimony, it is clear to the Court that Dr. Velez was more knowledgeable concerning the scientific materials concerning these disabilities than Dr. Lewis.
>
> Thus I find that carbon monoxide exposure does cause or materially accelerate or aggravate a coronary artery condition under the case of *Hellwig v. J.F. Rast & Company,* 110 *N.J.* 37 [538 *A.2d* 1243].
>
> I find that the petitioner has proven by a fair preponderance of the credible evidence that the angina incident of August 8th, 1986 was produced by the work effort or strain involving a substantial condition, event or happening in excess of the wear and tear of the petitioner's daily living and in reasonable, medical probability caused in a material degree, the angina and coronary artery disease resulting therefrom.

> Furthermore, pursuant to *Perez vs. Pantasote, Inc.,* 95 *N.J.* 105, [469 *A.2d* 22,] [ (1984) ] the petitioner has proved by a preponderance of the credible evidence that there is demonstrable objective medical evidence of his angina and coronary artery disease and it is causally related to his employment with the respondent, that such condition has lessened to a material degree the petitioner's ordinary life pursuits.
>
> Therefore, I find that the petitioner's angina accident of August 8, 1986 did arise out of and in the course of his employment.[4]

Respondent argues in its brief on appeal that, as a matter of law, coronary artery disease from occupational exposure, as alleged by petitioner, is not recognized by the New Jersey Workers' Compensation Act. In the alternative, respondent urges that if this court should find that a cause of action exists for an "occupational heart claim," it should be held that *N.J.S.A.* 34:15–7.2 governs the compensability of the claim. Thus, respondent asserts that petitioner did not sustain the burden of proof required for cardiovascular cases by *N.J.S.A.* 34:15–7.2 and, therefore, the judge's finding should be reversed. Finally, respondent asserts that the judge's decision must be reversed because he overstepped the permissible bounds of judicial inquiry by taking on the role of advocate for the petitioner.

Benefits for occupational disease are payable pursuant to *N.J.S.A.* 34:15–30. *N.J.S.A.* 34:15–31 sets forth the parameters of such claims as follows:

> a. For the purpose of this article, the phrase "compensable occupational disease" shall include all diseases arising out of and in the course of employment, which are due in a material degree to causes and conditions which are or were characteristic of or peculiar to a particular trade, occupation, process or place of employment.
>
> b. Deterioration of a tissue, organ or part of the body in which the function of such tissue, organ or part of the body is diminished due to the natural aging process thereof is not compensable.

In *Giambattista v. Thomas A. Edison,* 32 *N.J.Super.* 103, 107 *A.2d* 801 (App.Div.1954), Judge Hall (later a Justice of our New Jersey Supreme Court) detailed the evolution of our occupational disease compensation laws as follows:

---

[4] The judge had previously dismissed Claim Petition 86–31585, which was the petition alleging a specific incident of August 8, 1986.

The legislative history of compensation for occupational disease in this State has pertinency to the solution of the questions before us. It was first granted as to nine listed diseases by *L.* 1924, *c.* 124, *p.* 231, which was a supplement to the original compensation act of 1911. Mesothorium or radium poisoning was added and some language changes made by amendments thereto in the course of the next several years. *L.* 1926, *c.* 31, *p.* 62; *L.* 1931, *c.* 33, *p.* 76. The enactments as they stood in 1937 became *sections* 34:15–30 to 34:15–37, inclusive of the *Revised Statutes.* Thereafter, dermatitis venenata was added to the disease list and further language and procedural changes made. *L.* 1938, *c.* 419, *p.* 1208; *L.* 1945, *c.* 53, *p.* 318; *L.* 1948, *c.* 468, *p.* 1916. Silicosis and asbestosis were made compensable and treated specially by a supplement to *chapter* 15 of *Title 34* in 1944. *L.* 1944, *c.* 88, *p.* 186. *L.* 1949, *c.* 29, effective January 1, 1950, amended the sections to include, by general language, all occupational diseases as therein defined, except asbestosis and silicosis, and removed the schedule of diseases. The special silicosis and asbestosis act was repealed by *L.* 1951, *c.* 59, *p.* 412, thus placing those diseases on the same basis of compensability as all others.

By section 1 of the 1940 law, "compensation for personal injuries to or for death of such employee by any compensable occupational disease arising out of and in the course of his employment, as hereinafter defined, shall be made by the employer to the extent hereinafter set forth and without regard to the negligence of the employer ˮ ˮ ˮ." *N.J.S.A.* 34:15–30. It is to be that the language used is essentially the same as that in the corresponding section of the basic 1911 statute granting compensation in case of injury or death by accident. *R.S.* 34:15–7.

A compensable occupational disease is defined by section 2 of the 1949 act as follows:

"[It] shall include all diseases arising out of and in the course of employment, which are due to causes and conditions which are or were characteristic of or peculiar to a particular trade, occupation, process or employment, *or* which diseases are due to the exposure of any employee to a cause thereof arising out of and in the course of his employment." *N.J.S.A.* 34:15–31.

All provisions of the general compensation law applicable to claims for injury or death by accident were enjoined by the 1924 supplement to apply to injury or death by compensable occupational disease, except where inconsistent. *R.S.* 34:15–35.

  *  *  *  *  *  *  *  *

*The 1949 amendment is deliberately comprehensive in language and scope.* It even covers a disease the risk of which is not generally known in the particular employment or where the contraction of it is the result of the individual susceptibility or allergy of the particular employee, so long as it is due to exposure to a cause thereof arising out of and in the course of the employment. *Stepnowski v. Specific Pharmaceuticals, Inc.,* 18 *N.J.Super.* 495 [87 *A.*2d 546] (App.Div.1952); *Bondar v. Simmons Co.,* 23 *N.J.Super.* 109 [92 *A.*2d 642] (App.Div.1952), affirmed on opinion below, 12 *N.J.* 361 [96 *A.*2d 795] (1953).

[32 *N.J.Super.* at 110–11, 107 *A.*2d 801 (emphasis added).]

The 1979 amendments deleted the provision which Judge Hall noted was "deliberately comprehensive in language and scope." *See Bober v. Independent Plating Corp.*, 28 *N.J.* 160, 173, 145 *A.*2d 463 (1958) (demonstrating liberal construction of now deleted provision). The expunging of the language, "or which diseases are due to the exposure of any employee to a cause thereof arising out of and in the course of his employment," served to restrict recovery to occupational exposures peculiar to or characteristic of the employment. Judge Kumpf explained:

> The practical effect of the revision is best presented by an example. If an employee contracted pneumonia as a result of working in a freezer as a packer, the condition would be a compensable occupational disease because it would be due to a cause which is peculiar to the employment. If the same employee contracted pneumonia as a result of incidental exposure to a fellow employee with pneumonia, however, this might not be compensable because the condition may not be due to a condition characteristic of or peculiar to the employment. Such a condition would have been compensable, of course, under the eliminated portion of the definition in the old Act. Therefore, beyond the requirement that an occupational disease arise out of and in the course of employment, it must also be peculiar to or characteristic of the employment.
>
> [Fred H. Kumpf, *Occupational Disease Claims Under The Workers' Compensation Reforms*, 12 *Seton Hall L.Rev.*, 470, 472–73 (1982).]

Nonetheless, nothing in the present statute or its history supports the contention that a claim for cardiovascular disability caused by occupational exposure is not sustainable under New Jersey's Workers' Compensation Act, so long as the exposure arises out of and in the course of the employment and is also due in material degree to conditions peculiar to or characteristic of the employment. *N.J.S.A.* 34:15–31 no longer enumerates the causes of occupational exposure which may give rise to a compensable injury or disease, nor does it specify the diseases for which compensation may be allowed.

Occupational injury or diseases resulting from carbon monoxide exposure have been recognized in many other jurisdictions. In fact, many states that enumerate allowable occupational exposures have added carbon monoxide poisoning to the existing schedules in their Workers' Compensation Act. These jurisdictions are: Ari-

zona, Arkansas, Colorado, Idaho, Iowa, Kansas, Nevada, New York, North Carolina, Oklahoma, Puerto Rico, Rhode Island, Virginia, and Wyoming. Arthur Larson, *The Law of Workmen's Compensation,* Vol. 1B, § 41.71 (1987).

■ We have no doubt that under our occupational disease statute, on proper proofs and sound scientific evidence, carbon monoxide could qualify as a causative agent of cardiovascular disease, and that such disease can be the basis of an award of benefits under the Act. We so hold.

What then of the applicability of *N.J.S.A.* 34:15–7.2? In the typical heart-related claim for injury or death due to work effort, it is generally a foregone conclusion that coronary artery disease was present when the work effort alleged to have caused an attack was undertaken. *N.J.S.A.* 34:15–7.2 was intended to relieve an employer of those claims where the employee's heart attack was as likely to have been precipitated whether the employee was on-the-job or off because the work effort was no greater than might be encountered by the petitioner in the usual activities engaged in off-the-job. *Hellwig v. J.F. Rast & Co., Inc.,* 215 *N.J.Super.* 247, 251, 521 *A.*2d 896 (App.Div.1987), *aff'd,* 110 *N.J.* 37, 538 *A.*2d 1243 (1988).

Section 7.2 is titled "Claim based on cardiovascular or cerebral vascular causes; preponderance of the credible evidence of proof of cause by work effort." It provides as follows:

> In any claim for compensation for *injury or death from cardiovascular or cerebral vascular causes,* the claimant shall prove by a preponderance of the credible evidence that the *injury or death was produced by the work effort or strain* involving a substantial condition, event or happening *in excess of the wear and tear of the claimant's daily living* and in reasonable medical probability caused in a material degree the cardiovascular or cerebral vascular injury or death resulting therefrom.
>
> Material degree means an appreciable degree or a degree substantially greater than de minimis.

[*N.J.S.A.* 34:15–7.2. (emphasis added).]

Here, petitioner is attempting to prove that his underlying coronary artery disease was itself caused by exposure to carbon

monoxide at work. Section 7.2 is not designed for practical application to such a claim. Indeed, the language of *N.J.S.A.* 34:15–7.2 is hardly capable of being applied to occupational exposure to fumes or toxins which bring about cardiovascular disease. The work effort in such circumstances is irrelevant, except perhaps to the extent that any exercise may be therapeutic if maintained on a long term basis.

The Workers' Compensation judge purported to apply *N.J.S.A.* 34:15–7.2 in the present matter. However, he was only able to make the application somewhat intelligible by reverting to the work effort of the August 8, 1986 incident which claim petition he had previously dismissed. If the first part of *N.J.S.A.* 34:15–7.2 were applied literally to a heart disease claim based on occupational exposure, the court would have to find that the work effort or strain was in excess of the wear and tear of petitioner's daily living. In such a case, however, work effort has nothing to do with petitioner's claim for occupational exposure. The fact that the present petitioner's work effort as a truck driver was "probably" more strenuous than his activities outside of work has no practical relationship to his claim that exposure to carbon monoxide fumes gave him coronary artery disease. Nor was there any relevance to his testimony that he took care of his lawn, painted his house, played with his son, and played racquetball. There was no assertion that these activities, despite the effort involved, exposed him to fumes or otherwise caused his underlying heart disease.

*N.J.S.A.* 34:15–7.2 was one of the 1979 amendments to the Workers' Compensation Act intended to reform the existing case law. It imposed specific requirements for proof of claims based on injury or death from cardiovascular or cerebral vascular causes. *Hellwig v. J.F. Rast & Co., Inc.*, 110 *N.J.* 37, 39, 538 *A.*2d 1243 (1988) (citing *L.*1979, c. 283, § 3.). *N.J.S.A.* 34:15–31a only broadly defines compensable occupational diseases in general, mandating that it be "due in a material degree" to conditions peculiar to the employment. It does not define "material degree" as does

*N.J.S.A.* 34:15–7.2. There is, however, sound reason to apply the definition of "material degree" from section 7.2, as well as the spirit of the entire section, particularly where the occupational exposure involves a heart claim. *See* Kumpf, *supra,* 12 *Seton Hall L.Rev.* at 473.

In *Hellwig, supra,* our New Jersey Supreme Court, in affirming the award of dependency benefits for the death from a heart attack of an employee due to work related effort, agreed that there was no need to prove that the work effort was in excess of that ordinarily and regularly encountered in the workplace. 110 *N.J.* at 42, 538 *A.*2d 1243. The *Hellwig* Court observed that the correct interpretation of *N.J.S.A.* 34:15–7.2 depends on a "trilogy of workers' compensation cases involving coronary disease: *Seikin v. Todd Dry Dock, Inc.,* 2 *N.J.* 469, 67 *A.*2d 131 (1949); *Ciuba v. Irvington Varnish & Insulator Co.,* 27 *N.J.* 127, 141 *A.*2d 761 (1958); and *Dwyer v. Ford Motor Co.,* 36 *N.J.* 487, 178 *A.*2d 161 (1962)." *Ibid.* These cases involved specific work effort that produced an accident or heart attack and they did not involve claims of exposure related to "occupational heart disease," as in the present case. The Legislature, when enacting *N.J.S.A.* 34:15–7.2, as part of the 1979 amendments to the Act, expressed its intention to modify the holding in *Dwyer* by stating:

This legislation would benefit employers by:

. . . .

(2) *countering the far-reaching effects of Dwyer v. Ford in cardiac claims by requiring that a petitioner prove that the injury or death involved substantial effort or strain which was in excess of the rigors of the claimant's daily living and that the cause of injury or death was job-related in a material degree.*

[Joint Statement to Senate Committee Substitute for Senate, No. 802 and Assembly Committee Substitute for Assembly, No. 840 (emphasis added).]

■ The *Hellwig* court advised that when there is conflicting medical testimony, "compensation judges should be informed of contemporary medical standards so that they may be knowledgeable and circumspect in their assessment of conclusory expert testimony in heart cases." *Id.* 110 *N.J.* at 54, 538 *A.*2d 1243. In

an exposure case, this principle would extend to scientific and empirical studies as well as medical theory and data.

The court viewed the Legislature's modification of the *Dwyer* criteria "as an effort to require more reliable proof of the connection between work effort and cardiac dysfunction." *Ibid.* The Court further advised that the expert witness's conclusion in a heart compensation case "be carefully evaluated in the context of both the statutory criteria and prevailing medical standards." *Ibid.* In addition, the Court stated that a judge's evaluation "should take into account the worker's medical history, the intensity and duration of the precipitating work effort, and the time interval between the work effort and the evidence of heart dysfunction." *Ibid.* The Court warned compensation judges to be "particularly skeptical of expert testimony that supports or contests a finding of causation on the basis of reasoning inconsistent with prevailing medical standards." *Ibid.*

█ When we review a decision of a Workers' Compensation judge, the general rule is that we will only decide whether the findings made could reasonably have been reached on "sufficient" or "substantial credible evidence present in the record," considering the proof as a whole. *Close v. Kordulak Bros.,* 44 *N.J.* 589, 599, 210 *A.*2d 753 (1965).

█ We conclude that the record here is deficient in several respects. *First,* no toxicologist or other expert was produced to inform the factfinder as to the relative amounts of carbon monoxide found in diesel exhaust. A heavy duty diesel engine may emit less than one-fifth the carbon monoxide of a comparable gasoline engine. *Assessment of Control Strategies For Heavy–Duty Diesel–Powered Vehicles,* Final Report prepared for the New Jersey Dep't of Environmental Protection, Bureau of Transportation Control (Radon Corp., Austin, Texas), Oct. 24, 1989 at 2–7. We know, however, that our "subjective" reaction to diesel fumes is that they

are much "worse" than exhaust from gasoline engines.[5]  *Second,* the environment which petitioner worked in was not tested.  It was only this "subjective" description of the fumes by petitioner as to his exposure at the terminal, in his cab, and at his stops, which was used by the medical expert and the judge to evaluate petitioner's working conditions and exposure.[6]  *Third,* although much is available on the subject, none of the scientific data made available to the court, either through the medical expert's testimony or the written articles entered in evidence, dealt specifically with exposure to diesel fumes.[7]  Exposure to fumes created by motor vehicle traffic in general is not germane to petitioner's claim that diesel fumes produced carbon monoxide which caused his cardiovascular disease, except to the extent a comparison of such everyday exposure with the work environment exposure may be legally relevant.  *Fourth,* petitioner's scientific proof demonstrates that smoking of two packs of cigarettes per day over a period of twenty years subjected the petitioner to sufficient carbon monoxide and toxins to cause the heart disease he claimed was work-related.  *Fifth,* petitioner's medical expert was unable to quantify

---

[5] This *subjective evaluation is correct with respect to particulate matter* or solid emissions, but not the gas portion which is made up of nitrous oxide, carbon monoxide, and polycyclic aromatic hydrocarbons.  Kelly Hughes, Linda Martz & Joan Denton, *The Air Resources Board's Risk Assessment of Diesel Exhaust,* California Air Resources Bd., CAPCOA Engineering Symposium (Dec. 5–7 1990).

[6] Since 1973, OSHA has published specific threshold limits for occupational exposure to carbon monoxide from diesel exhaust.  *Carcinogenic Effects of Exposure to Diesel Exhaust,* Current Intelligence Bulletin 50 (National Institute for Occupational Safety and Health), August 1988.  These levels appear to be related to the cancer risk from the respirable particulate matter.

[7] *See* Elaine Dibbs, Emerson Thomas, Jr., Slott T. Weiss and David Sparrow, *Fire Fighting and Coronary Heart Disease,* Circulation, Vol. 65, No. 5 (May 1982); Editorial, *Smoking and Coronary Heart Artery Disease,* Chest, Vol. 94, No. 3 (Sept.1988);  Wilbert S. Aronow, *The Effects of Carbon Monoxide on Cardiovascular Disease,* Preventive Magazine, Vol. 8 (Oct. 10–12, 1978); and Elizabeth Feuer and Kenneth Rosenman, *Mortality in Police and Firefighters in New Jersey,* American Journal of Industrial Medicine, Vol. 9 (1986).

the extent to which cigarette smoking for twenty years caused petitioner's disability because "it's the same agent." *Sixth*, the fact that petitioner's pulmonary disability was so "mild" as to require dismissal of his claim belies significant exposure and causal connection between his exposure to diesel fumes and his heart disease, as the available scientific studies indicate that exposure to toxic levels of diesel fumes produces disabling respiratory changes in affected workers.[8]

■ We turn again to the 1979 amendment to *N.J.S.A.* 34:15–31, which resulted in the deletion of the more encompassing language that stated, "or which diseases are due to the exposure of any employee to a cause thereof arising out of and in the course of his employment." The effect of this amendment was to place New Jersey on virtually the same level as states which have included in the language of their occupational disease statutes the limitation that the disease does not qualify if it comes "from a hazard to which workmen would have been equally exposed outside of the employment." *See*, for example, Ch. 71, § 5, 1975 Colo.Sess.Laws 293. As noted earlier, the enactment of the 1979 amendment to the occupational disease section of the Act made the test of compensability for occupational diseases more stringent than for work-connected accidents and injuries. *See* Kumpf, *supra*, 12 *Seton Hall L.Rev.* at 471.

■ Therefore, to be true to the Legislature's intent, when dealing with claims of heart disease related to occupational exposure, the test for compensability must be at least as stringent as those set forth in section 7.2 of the 1979 amendments relating to cardiovascular accidents and injuries caused by work effort. Where the exposure is related to toxic fumes, the test called for would translate to requiring proof that the exposure was in excess of that ordinarily encountered in every day living, that it arose out of and in the course of the employment, and that it was due in a material degree to causes peculiar to the particular employment.

---

[8] See *supra* note 5.

*N.J.S.A.* 34:15–31a; *see Anderson v. Brinkhoff,* 859 *P.*2d 819, 822–23 (Colo.1993).

It can be seen that in certain types of exposure the requirement that the disease be "due in a material degree to causes and conditions which are or were characteristic of or peculiar to a particular trade, occupation, process or place of employment," may not constitute a high threshold, depending on the unique nature of the exposure and employment. *N.J.S.A.* 34:15–31a. On the other hand, it can just as readily be seen that in instances such as the present, where the exposure to exhaust fumes is common to most everyone, the requirement that the risk or hazard be greater than that experienced outside of the employment becomes "measurably" more important. Tests have shown that the motoring public in general and commuters in particular are exposed to high levels of carbon monoxide by environmental pollution from vehicular traffic, especially in and around intersections, bridges, tunnels, toll booths and the like. *See* Kelly Hughes, Linda Martz & Joan Denton, *The Air Resources Board's Risk Assessment of Diesel Exhaust,* California Air Resources Bd., CAPCOA Engineering Symposium (Dec. 5–7, 1990).

Thus, in the present case, there was the need to identify and quantify the level of exposure to carbon monoxide in the work environment of the petitioner. For example, if a petitioner's morning deliveries merely placed the driver in the flow of commuter traffic and that exposure over a period of time caused respiratory disease, there could be no recovery under our occupational disease statute because the disease cannot be shown to be materially due to conditions *peculiar* to petitioner's particular employment. However, if the worker were able to prove that the truck which was regularly driven in the employment caused the exposure, then, even though engaged in that same delivery route, the worker would qualify for benefits under our Act to the extent to which the disease was related to the exposure from the truck.

In the present case, we are dealing with concomitant causes of the disease of which petitioner complains. His several health

risks, including cigarette smoking, are unrelated to the hazards of his employment. They are hazards for which the Legislature, in enacting the 1979 amendments, intended that the employer not be held responsible. This intent is reflected in the requirement that the disease arise out of and in the course of the employment and be due in a material degree to causes and conditions which are characteristic of or peculiar to a particular occupation or place of employment; the Legislature's expungement of the earlier more liberal occupational exposure definition, and the enactment of *N.J.S.A.* 34:15–12(d).

Part of the mechanism for dealing with other exposures or conditions which contribute to a petitioner's disability, where they manifest a "previous loss of function to the body, head, or a member or organ," is found in *N.J.S.A.* 34:15–12(d). This section, also a part of the 1979 amendments, reads as follows:

> If previous loss of function to the body, head, a member or an organ is established by competent evidence, and subsequently an injury or occupational disease arising out of and in the course of an employment occurs to that part of the body, head, member, or organ, where there was a previous loss of function, then and in such case, the employer or the employer's insurance carrier at the time of the subsequent injury or occupational disease shall not be liable for any such loss and credit shall be given the employer or the employer's insurance carrier for the previous loss of function and the burden of proof in such matters shall rest on the employer.

[*N.J.S.A.* 34:15–12(d).]

In *Field v. Johns–Manville Sales Corp.*, 209 *N.J.Super.* 528, 531, 507 *A.*2d 1209 (App.Div.), *certif. denied*, 105 *N.J.* 531, 523 *A.*2d 172 (1986), we noted that section 12(d) "represented a significant departure from prior law." We held that the employer was entitled to a "credit for the functional loss attributable to cigarette smoking when that loss can be quantified." *Id.* at 530, 523 *A.*2d 172. As we stated in *Field*, the 1979 amendments abrogated the earlier rule, *see Wexler v. Lambrecht Foods*, 64 *N.J.Super.* 489, 166 *A.*2d 576 (App.Div.1960), *certif. denied*, 34 *N.J.* 326, 168 *A.*2d 691 (1961), that "any aggravation, acceleration or exacerbation of a pre-existing condition made an employer

liable for the whole resultant disability." *Id.* 64 *N.J.Super.* at 531, 166 *A.*2d 576. Therefore, a petitioner may only be awarded compensation to the extent that the occupational conditions contributed to the disease and disability. *N.J.S.A.* 34:15–12(d); *see Abdullah v. S.B. Thomas, Inc.,* 190 *N.J.Super.* 26, 32–33, 461 *A.*2d 1179 (App.Div.1983) (the 1979 amendment "gives the employer credit for previous loss of function, whether work-connected or not"); *see also Masdin v. Gardner–Denver–Cooper Indus.,* 689 *P.*2d 714, 717 (Colo.Ct.App.1984), cited with approval in *Anderson v. Brinkhoff, supra,* 859 *P.*2d at 825.

Here, it is evident from the medical proofs that the origin of petitioner's heart disease may be due to many factors which are at least co-equal to his alleged occupational exposure. Besides the natural aging process, his risk factors include heavy smoking, obesity, and the fact that his father died of heart disease at 59. Therefore, even if petitioner's occupational exposure had been quantified and it had been demonstrated that his disease was attributable to the alleged occupational exposure, his award must be limited to that percentage of his disease and disability attributable to the occupational exposure. We suspect that even the underlying validity of *Bolger v. Chris Anderson Roofing Co., Inc.,* 112 *N.J.Super.* 383, 271 *A.*2d 451 (Law Div.1970), *aff'd o.b.* 117 *N.J.Super.* 497, 285 *A.*2d 228 (App.Div.1971), as it pertains to an employer's responsibility for any aggravation of a pre-existing condition, may be seriously undermined. (See discussion therein of New York rule vs. California rule regarding the effect of pre-existing conditions in occupational diseases cases.) We make no holding on this additional issue as there is no evidence of aggravation in the present case.

We hold that the judge of compensation erred in his conclusion that occupational exposure to carbon monoxide was proven to be responsible for petitioner's heart disease. He also erred in failing to assess the proofs as to the percentage of petitioner's disability which was directly attributable to occupational exposure. *See N.J.S.A.* 34:15–12(d); *see also Field, supra,* 209 *N.J.Super.* at 531,

507 *A.*2d 1209 (holding that the compensation judge is "required to give the employer credit for the functional loss attributable to cigarette smoking when the loss can be quantified.")

There can be no recovery in the present case because the proofs presented fail, as we have outlined herein, to support the conclusion that petitioner's disease is related to a material degree to his occupational exposure to diesel fumes during and in the course of his employment with respondent.

Reversed and remanded for dismissal of Claim Petition.