No. 88-252

IN THE SUPREME COURT OF THE STATE OF MONTANA

1989

IRENE WOOD,

        Claimant and Appellant,

   -vs-

ULMER'S CAR AND TRUCK, Employer,
     and
STATE COMPENSATION INSURANCE FUND,

       Defendant, Respondent and Appellant.

ED SMITH, CLERK
MONTANA SUPREME COURT

FILED

'89 MAR 7 AM 11 29

APPEAL FROM:  The Workers' Compensation Court, The Honorable Timothy
             Reardon, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        R.V. Bottomly; Bottomly Law Offices, Great Falls,
        Montana

    For Respondent:

        Mike McCarter; Hughes, Kellner, Sullivan & Alke,
        Helena, Montana

Submitted on Briefs:  Dec. 16, 1988

Decided:  March 7, 1989

Filed:

_____
          Clerk

Mr. Justice R. C. McDonough delivered the Opinion of the Court.

This appeal and cross-appeal from the Workers' Compensation Court involves a claim for widow's benefits. The State Compensation Insurance Fund (Fund), appeals the lower court's decision finding claimant's husband suffered an injury resulting in death under the Montana Workers' Compensation Act. The claimant, Irene Wood, cross appeals contending that the lower court erred in refusing to provide attorney fees due from the insurer in a lump sum. We affirm the lower court's decisions in regard to the appeal and the cross-appeal.

## Appellant's Issue

Whether the Workers' Compensation Court erred in awarding benefits to the widow of a worker based on the conclusion that the worker's exposure to carbon monoxide caused his heart attack?

The relevant facts are as follows: Irene's husband, Duane Wood, worked approximately ten years as a mechanic at Ulmer's Car & Truck in Great Falls. Duane suffered from hypertension and an enlarged heart, musculoskeletal problems, low potassium levels, and cardiovascular disease. Duane was 49 years old when he died of a heart attack on October 29, 1984.

Duane's doctor had diagnosed and treated most of his various ailments, but had no knowledge of his moderate to severe coronary artery disease until after Duane's autopsy. The autopsy revealed moderate to severe narrowing due to coronary arteriosclerosis.

Duane smoked a pipe. He had switched from cigarettes to a pipe a few years before his death. Irene testified he did not inhale the pipe smoke. Duane also liked to drink one or

two beers after work. The last two years his pace in completing repairs at Ulmer's slowed considerably.

Duane worked the Friday before his death. On Friday evening Duane skipped dinner and went straight to bed complaining of extreme fatigue and shoulder pain. On Saturday morning he collapsed and was taken to the hospital. When he arrived at the hospital he was suffering from cardiac arrest probably due to ventricular fibrillation. Two days later he died. Duane's behavior on Friday night indicated he experienced the onset of a myocardial infarction.

Irene testified that approximately two months before his death Duane began to exhibit loss of balance and appetite. During this period he also lost weight and experienced breathlessness and coughing. These symptoms, according to Irene, increased in September of 1984. Duane also complained of cold and fumes at work.

Ulmer's Car and Truck operates in a building containing seven service bays. The business employs five mechanics and two mechanic's helpers. The helpers perform routine service and the mechanics handle minor to major repairs. The bays are often full with vehicles undergoing servicing or repair.

Carbon monoxide escapes into the air from the exhaust of cars driven in and out of Ulmer's shop. When an auto is run in the shop, workers hook a hose to the auto's tail pipe. The hoses channel the carbon monoxide outside the building. Even when exhaust escapes outside through the hoses, leaky manifolds and other sources associated with running the cars inside contribute to the presence of carbon monoxide in the air of the garage.

A twenty four inch fan in the wall of the garage and two ceiling fans help to circulate air and dissipate the carbon monoxide. Employees also help to rid the garage of the gas by opening windows and the doors that access the bays.

3

Employees open the doors and windows more often on warmer days than on colder days. The high temperature recorded in Great Falls on Duane's last day of work was 51 degrees Fahrenheit.

Irene hired Dr. Anderson to testify on the possible effects of carbon monoxide on individuals with cardiovascular disease. Anderson testified that individuals suffering from cardiovascular disease risk precipitating a heart attack by breathing carbon monoxide. The risk exists, according to Anderson, because carbon monoxide molecules bond more strongly to hemoglobin than oxygen molecules. Anderson testified that where concentrations of carbon monoxide in the air exist, the strength with which carbon monoxide binds to hemoglobin allows it to displace a portion of the oxygen one would normally obtain by breathing. The already reduced ability of individuals suffering from cardiovascular disease to supply the heart with oxygen, when combined with the effects of breathing air contaminated by concentrations of carbon monoxide, may precipitate a heart attack, according to Anderson.

Anderson considered the likelihood that inhalation of carbon monoxide caused Duane's heart attack. Testing done on February 26, 1985, when the high temperature in Great Falls reached 43 degrees Fahrenheit demonstrated the presence of carbon monoxide in the air of the garage. Anderson testified that the levels of the gas present at that time could have posed a health risk to Duane. Anderson also noted inhalation of the gas in amounts sufficient to cause oxygen deprivation may result in headaches, dizziness, confusion, and coughing. Amounts too small to cause symptoms in ordinary individuals may nevertheless affect those suffering from cardiovascular disease.

Based on the presence of carbon monoxide concentrations in the garage, the compatibility of Duane's symptoms with the effects of carbon monoxide in the blood, and a lengthy hypothetical propounded by claimant's counsel incorporating Irene's testimony and Duane's autopsy report, the following exchange occurred:

Q   Taking into account the symptoms suggested by the question over the preceding month period and on the night of decedent's collapse, and taking into account the levels of carbon monoxide concentrations reported in the question, in your opinion did such levels of carbon monoxide aggravate his underlying heart disorder?

A   It certainly is probable that it did.

Q   Would the symptoms listed by the decedent be consistent with the levels of carbon monoxide reported in the question?

A   Yes.

Q   Taking into account the decedent's heart condition, as reported in the autopsy, and the levels of carbon monoxide reported, could these levels trigger or precipitate a new stage of pathology or a new dysfunction in the heart condition?

A   Yes, it could.

Q   In your opinion, did the levels of carbon monoxide aggravate, hasten, trigger or precipitate a new stage of pathology or a new dysfunction in his heart condition?

A   It was a precipitating factor, I think.

Q   And in your opinion, did they do so?

A   All I can say is that it's probable that the high levels of carbon monoxide were a precipitating factor in the final stage of events that led to his death.

On cross-examination, Anderson testified as follows:

Q Okay, I think I asked you earlier, but as I understand it, it is not your opinion that the carbon monoxide exposure triggered his heart attack?

Mr. Bottomly [claimant's counsel objecting]: Wait a minute, that is contrary to his opinion.

Q Well, let's ask you what your opinion is.

A Okay, my opinion is that it's a risk factor that certainly could have triggered -- we don't know, you know, it did with certainty, but it's certainly a risk factor.

Q It's a risk factor, but you don't know for certain?

A Right.

Q And there were a number of other risk factors in this case?

A That's correct.

Q The cigarette smoking, the hypertension; correct?

A Right, for developing coronary artery disease, right.

Q Was carbon monoxide any greater risk factor than those factors?

A Carbon monoxide was a risk factor just in the final event, not in the development of the coronary artery disease, so the others played a role in developing the coronary artery disease, put him at higher risk for having a myocardial infarction, but the carbon monoxide was only with respect to having symptoms from coronary disease and eventually developing a myocardial infarction.

Q I guess what I'm asking here is can you attribute his heart attack and his sudden death to

6

carbon monoxide as opposed to cigarette smoking, hypertension or anything else, for that matter.

A    No.

The Fund contends that Irene failed to carry the burden of proving inhalation of carbon monoxide caused an injury resulting in death under §§ 39-71-721(1), 39-71-119, MCA (1983):

39-71-721.  Compensation for injury causing death. (1)  if an injured employee dies and the injury was the proximate cause of such death ...

39-71-119.  Injury or injured defined. "Injury" or "injured" means:
    (1) a tangible happening of a traumatic nature from an unexpected cause or unusual strain resulting in either external or internal physical harm and such physical condition as a result therefrom and excluding disease not traceable to injury, except as provided in subsection (2) of this section ...

    (3)  death resulting from injury.

The Fund cites several cases where this Court affirmed the Workers' Compensation Court because the claimant failed to demonstrate causation even though "medical possibility" evidence existed.  See, Brown v. Ament (Mont. 1988), 752 P.2d 171, 45 St.Rep. 508; Currey v. 10 Minute Lube (Mont. 1987), 736 P.2d 113, 44 St.Rep. 790, Ferdinand v. Lodge No. 456 (Mont. 1986), 719 P.2d 775, 43 St.Rep. 955, Wheeler v. Carlson Transport (Mont. 1985), 704 P.2d 49, 42 St.Rep. 1177. The Fund contends that the similarity of this case to the cited cases mandates the conclusion that Irene failed to demonstrate causation.  We disagree.

7

In Brown, the claimant failed to come forward with sufficient evidence to corroborate testimony revealing the medical possibility of causation. Brown, 752 P.2d at 175. In Curry, the medical evidence conflicted. Curry, 736 P.2d at 116. The medical experts in Ferdinand never offered testimony that the claimed injury more probably than not caused claimant's heart attack. Ferdinand, 719 P.2d at 777. And in Wheeler, conflicting evidence also led this Court to affirm denial of benefits. Wheeler, 704 P.2d at 54.

Here, Anderson testified carbon monoxide was probably a precipitating factor in causing Duane's death. Irene's testimony corroborates Anderson's opinion. Thus, substantial evidence supports the decision of the lower court.

The Fund contends that Anderson contradicted his earlier testimony under cross-examination when he stated that he could not attribute the heart attack to carbon monoxide as opposed to other factors which could have caused the attack. However, the Fund questioned Anderson only on whether or not he was certain that carbon monoxide caused the fatal illness. Anderson never refuted or explained away his opinion that carbon monoxide probably precipitated events leading to Duane's death. Moreover, the lower court has the duty to resolve conflicts in the evidence, and this Court may not substitute its judgment for the judgment of the lower court when substantial evidence supports the lower court's decision. Ferdinand, 719 P.2d at 776. Thus the we affirm the lower court's finding on causation.

The Fund also contends that insufficient evidence supports the lower court's finding that the heart attack met the requirement of time definiteness for finding an injury under § 39-71-119, MCA. We disagree.

Evidence disclosed the worsening effects of oxygen deprivation on Duane's health two months prior to his death.

The night before his death, the lower court found that oxygen deprivation precipitated the heart attack. Anderson testified that Irene's description of Duane's symptomatology on the Friday before he collapsed indicated the onset of a myocardial infarction probably triggered by inhalation of carbon monoxide. Thus, while Duane's cardiovascular disease developed over time, the event that deprived his heart of enough oxygen to continue pumping probably occurred on his last day of work. Under these circumstances, substantial evidence supports the finding of time definiteness by the lower court. Daniels v. Kalispell Regional Hospital (Mont. 1988), 750 P.2d 455, 45 St.Rep. 310.

## Cross Appellant's Issue

Whether the lower court erred in denying lump sum attorney fees for future benefits?

On cross-appeal Irene contends that the lower court erred in refusing to provide the attorney fees due from the Fund for future benefits in a lump sum. We disagree. The applicable statute, § 39-71-611, MCA (1983), provides for an award of attorney fees and costs from the insurer. The amount and kind of fees, lump sum or periodic, must be reasonably established by the Workers' Compensation Court. The lower court acts reasonably and within its discretion by refusing to lump sum attorney fees owed for benefits which may never accrue. Davis v. Jones (Mont. 1987), 745 P.2d 362, 365, 44 St.Rep 1859, 1862. Thus, we affirm the cross appeal.

_____
Justice

We Concur:

_____
Chief Justice

9

_____
John Conway Harrison

_____
K. C. Gullbrandson

_____
Justices

Mr. Justice John C. Sheehy, concurring in part and dissenting in part:


I concur with that portion of the opinion that finds that the decedent suffered a compensable injury. I dissent from that portion of the opinion that relates to the attorney's fees.

When this case first came before our conference for the purpose of classification, I contended that we should have oral argument relating to the attorney's fee issue. The evolution of the opinion convinces me that my position was correct. The attorney's fee issue is decided in a single paragraph and its rationale is limited strictly to a conclusion that the Workers' Compensation Court acted reasonably. A lower court's decision is not "reasonable" simply because we say it is. Ipse dixit (he said so) is not a substitute for judicial dissection and discussion of an issue.

In this case we have record evidence that the claimant is in perfect health and has a life expectancy of 25.2 years. The attorney representing her is near retirement age. Actuarially, the claimant will outlive her attorney, and under our decision here, the attorney's estate may be paid for the work the attorney performed in his lifetime. I hope that does not happen, but the possibility shows how absurd the Workers' Compensation law has become.

The claimant's attorney compiled a record in this case which deserves the attention of this Court. He called an expert witness, Gene Picotte, a lawyer with 38 years of practice behind him, who specializes in representing compensation clients. Mr. Picotte testified from his experience that contingent arrangements are "absolutely

necessary in representing claimants." Without the possibility of contingent arrangements, most claimants could not afford attorneys or procure them on a fee basis. Indeed if the attorney must advance the costs, as we must admit occurs many times, long delays in collecting his fees can cause problems with cash flow, as Mr. Picotte testified.

Mr. Picotte also indicated that attorneys in the past have always anticipated that there would be lump sum payments in compensation cases. They anticipate receiving as fees a percentage of future benefits. It was his opinion that lawyers will not take cases with long-deferred fees because they cannot afford to do so. Denial of lump sum attorney's fees for future benefits frustrates the public policy of compensation for those who cannot competently represent themselves.

Especially, Mr. Picotte emphasized, long-deferred payments would have an adverse effect on older attorneys whose retirement security is compromised.

That record deserves some discussion. It is as important to the proper legal administration of workers' compensation cases to have an able claimant's bar available for workers as it is to have fully compensated defense lawyers for the insurers. We are forcing the available bar to become unbalanced.

The position of this Court that there can be no attorney's fee recovery for future benefits until received is out of sync with respected authority in the field. Thus in Quam v. Minnesota (1986), 391 N.W.2d 803, the Minnesota Court said:

. . .

> We agree with a respected commentator in the
> workers' compensation field, . . . , that "[a]s a
> general matter, the claimant's attorney's fee

should be based on the facts as to his services in the compensation case as of the time the services were rendered, and should not be at the mercy of subsequent or collateral events over which he has no control." 3 A. Larson, The Law of Workmen's Compensation, § 83.13(i) (1983).

Indeed Larson goes on to say that paying the attorney in driblets from weekly installments over a long period means a disproportionate amount of bother for everyone concerned. § 83.13(j), id.

There is no statute in Montana requiring that an attorney be required to wait over a period of 25 years for his attorney's fee as it comes in dribs and dabs. The only requirement of § 39-71-611, MCA, once the right to attorney's fees is established, is that the fees be "reasonable." Who can contest that the payment of attorney's fees for services fully rendered over a score or more years is unreasonable?

The standard of appellate review of attorney's fees in workers' compensation cases is whether the Workers' Compensation Court abused its discretion in determining reasonable attorney's fees. Conway v. Blackfeet Indian Developers Inc. (1985), ___ Mont. ___, 702 P.2d 970. Here the contingency fee contract was approved but the attorney is deprived of the benefit of his contract. There is no reason why the Workers' Compensation Court could not award reasonably the attorney a percentage of future benefits by a discount factor to determine the present value of the future payments. The attorney in this case offered such a basis. The offer is completely reasonable and should not be denied simply because the worker might die or the widow might remarry. Certainly the Board has enough experience in its own files to determine how many of its widows remarry during the compensation payment period from which a factor could be derived to be applied. As to the actuarial life expectancy

of the claimant, the whole business of insurance relies on actuarial tables and it would not be unreasonable for the Workers' Compensation Court to rely on tables in computing attorney's fees for future benefits.

We have a serious problem developing in this field. Reputable attorneys who in the past have represented claimants for workers' compensation are leaving the practice because of the niggardly compensation afforded them by the Workers' Compensation Division, by the Workers' Compensation Court, and lately by this Court. The development of an able compensation bar is being hindered. A chilling effect on the workers' ability to obtain adequate representation is occurring. Davis v. Homestake Mining Company (N.M. Ct. App. 1986), 727 P.2d 941. We have blessed contingent attorney's fees as necessary in the field, but we abrogate the contingent fee contracts by proceeding as we have here. The requirement that no attorney's fee be paid for future benefits until received is an invention of this Court and we ought to change it.

John C. Sheehy
Justice

- 14 -