659 A.2d 436

JOHN FIORE, PETITIONER–APPELLANT, v. CONSOLIDATED
FREIGHTWAYS, RESPONDENT–RESPONDENT.

Argued November 7, 1994—Decided June 1, 1995.

456

*Michael J. Dillon* argued the cause for appellant (*Krumholz, Horn, Schechtman, Hirsch,* attorneys).

*Joseph M. Soriano* argued the cause for respondent (*Mattson, Madden & Polito,* attorneys).

*George W. Conk* argued the cause for *amici curiae* New Jersey State Industrial Union Council, AFL–CIO, District 15, International Association of Machinists & Aerospace Workers (*Ball, Livingston & Tykulsker* and *Tulipan & Conk,* attorneys; *Jon L. Gelman,* of counsel; *Mr. Conk* and *Craig H. Livingston,* on the brief).

The opinion of the Court was delivered by

POLLOCK, J.

We granted certification, 137 *N.J.* 165, 644 *A.*2d 613 (1994), to determine the standard of proof required to establish an occupational heart-disease claim under *N.J.S.A.* 34:15–1 to –128, the Workers' Compensation Act (the Act). We conclude generally that an employee claiming an occupational heart disease must show that the disease is due in a material degree to causes or conditions that characterize the employee's occupation and that substantially contribute to the development of the disease. That conclusion leads to a remand to the Division of Workers' Compensation (Division) to determine whether the work of petitioner, John Fiore, substantially contributed to his angina attack and coronary-artery disease. Complicating that determination are Fiore's personal-risk factors, including the facts that he had smoked two packs of cigarettes a day for twenty years, was fifty-sixty pounds overweight, and had a family history of heart disease. Thus, the case presents a question of dual causation concerning an occupational disease.

-I-

On August 8, 1986, Fiore suffered an angina attack while delivering freight. He filed two workers' compensation claims. The first petition alleged that Fiore's occupational exposure to "deleterious substances" had resulted in neurological, neuropsychiatric, and pulmonary injuries. The second alleged that he had suffered a heart attack at work that had resulted in neurological, neuropsychiatric, and heart injuries. The Workers' Compensation judge dismissed both claims. He dismissed the heart-attack claim for "failure to sustain burden of proof ... as to any specific incident," and the pulmonary-disability claim because Fiore's own expert had classified the disability as "mild."

Finding that the occupational exposure to carbon monoxide had caused Fiore's angina and coronary-artery disease, however, the judge awarded Fiore thirty-three and one-third percent of partial-total permanent disability. Pursuant to the requirements of

*N.J.S.A.* 34:15–7.2 (subsequently described as "section 7.2" or the "heart section" of the Act), the judge concluded that Fiore had

proven by a fair preponderance of the credible evidence that the angina incident of August 8th, 1986 was produced by the work effort or strain involving a substantial condition, event or happening in excess of the wear and tear of the petitioner's daily living and in reasonable, medical probability caused in a material degree, the angina and coronary artery disease resulting therefrom.

The judge thereby awarded Fiore 200 weeks of compensation at the rate of $133 per week for a total of $26,000.

The Appellate Division reversed and remanded for dismissal of the petition. 270 *N.J.Super.* 520, 637 *A.*2d 578 (1994). Although the Appellate Division agreed with the compensation judge's determination that Fiore's claim fell under section 7.2, the court held that Fiore had not met that section's burden of proof. The court acknowledged that section 7.2 is not designed for an occupational heart-disease claim, but concluded that to "be true to the Legislature's intent," the standard for such a claim "must be at least as stringent as those set forth in section 7.2...." *Id.* at 542, 637 *A.*2d 578. The Appellate Division posited the following test:

Where the exposure is related to toxic fumes, the test called for would translate to requiring proof that the exposure was in excess of that ordinarily encountered in every day living; that it arose out of and in the course of employment, and that it was due in material degree to causes peculiar to the particular employment.
[*Ibid.*]

Fiore petitioned for certification asserting that an occupational heart-disease claim should be analyzed under section 31, not section 7.2. Although we agree with petitioner that section 31, which pertains to occupational diseases, provides a more suitable framework for analyzing occupational heart-disease claims, a fair reading of the Act leads to the conclusion, as the Appellate Division recognized, that the analysis should proceed in light of the more stringent requirements of section 7.2. In reaching that conclusion, we acknowledge that we have gleaned the legislative intent, as did the Appellate Division, by reading sections 7.2 and 31 together. Thus, whether the analysis proceeds under section 31, as we deem appropriate, or under section 7.2, as the Appellate Division decided, the result remains that the compensability of

occupational heart diseases depends on satisfying the require-
ments of both sections. Our conclusion leads to a reversal of the
Appellate's Division's judgment and a remand to the Division.

-II-

At the time of his heart attack, Fiore was thirty-nine years old
and obese. Before the attack, he had smoked two packs of
cigarettes a day for twenty years. His father, moreover, had died
of a heart attack at age fifty-nine, thereby indicating a family
history of heart disease.

Fiore began working at Consolidated in June 1967. For the
first three-and-one-half years of his employment, he worked as a
freight mover, a position that required him to move freight from
truck to truck at Consolidated's terminals in Newark and Pater-
son.

Since January 1969, Consolidated has employed Fiore as a truck
driver. His duties entail picking up and delivering freight. The
drivers frequently leave the trucks running while they load and
unload them.

Fiore described the conditions at the Paterson facility as "terri-
ble," with "all kinds of dust and fumes and everything over there."
Trucks would be left "running from maybe 5 o'clock or 6 o'clock in
the morning until the drivers came in about 8 o'clock." No cross-
ventilation dissipated the fumes. Consolidated did not contradict
Fiore's description of the working conditions.

Before the angina incident, Fiore spent three hours out of a
twelve-hour working day driving his truck. In the past, the air
quality in the trucks was "pretty bad," particularly in the winter
when the windows were closed. The air quality in his current cab,
as he described it, is "O.K."

On August 8, 1986, when Fiore experienced his angina attack,
he had been working for about two to three hours. He had
unloaded about two hundred parcels, each weighing between forty
to one-hundred pounds. While working, Fiore felt chest pains and

discomfort, which caused him to rest a "few times." He left work at 6:00 p.m. On reaching home, Fiore informed his wife of his discomfort. He then went to West Caldwell Quick Med, which administered an EKG and immediately admitted him to St. Barnabas Hospital. He remained in the hospital for eight days. During his hospitalization, a catheterization was performed. Thereafter, he remained at home for five months.

Fiore testified that his health has deteriorated since the angina attack. He is now easily winded, can walk only one block before becoming short of breath, and can climb stairs only "a little at a time." Before the attack, he had played racquetball three times a week; now, he does not play. He does not perform housework, such as mowing the lawn, taking out the garbage, or painting the house because it is "too strenuous." Fiore sees a doctor every three months, and daily takes aspirin, as well as Lopressor (a beta blocker) and Isordil (a vasodilator).

Fiore returned to work in January 1987 and has continued his employment as a truck driver. He has since been elected shop steward, a position that involves one to two hours a day of paper work. In February 1988, Fiore suffered a "spasms" attack and was admitted to the hospital for three days.

Fiore claims that his coronary-artery disease results from exposure to carbon monoxide caused by diesel-exhaust fumes. His expert, Dr. Henry Velez, attributed Fiore's disease both to the workplace and other risk factors. Dr. Velez explained that prolonged exposure to carbon monoxide can cause plaque crystals that narrow the coronary arteries. That narrowing can result in angina, chest pain, and a heart attack. Dr. Velez acknowledged, however, that cigarette smoke also exposes the smoker to carbon monoxide and that Fiore's smoking was "certainly contributory to his overall disability." Although Dr. Velez concluded that "truck drivers and anyone exposed to vehicular exhaust is exposed to increased levels of carbon monoxide in contrast to persons who don't," he conceded that carbon-monoxide exposure from smoking two packs of cigarettes a day is "as significant as any exposure

that [Fiore] has as a truck driver." Further, Dr. Velez concluded that Fiore's "exposures to carbon monoxide through his work environment were materially related" to his coronary-artery disease and that it was impossible to determine what contributed more, the workplace or the smoking. Dr. Velez discounted the absence of carbon-monoxide tests in the workplace. He testified that because workers might "take up" carbon monoxide in various amounts, measuring the carbon-monoxide level in an individual's blood provided more relevant evidence than that provided by measuring carbon monoxide in the workplace. Dr. Velez then admitted, however, that he did not know the levels of carbon monoxide in petitioner's blood.

On cross-examination, Dr. Velez conceded that simple blood tests could determine the carbon-monoxide levels and admitted that he had not conducted any such tests. Instead, he relied on Fiore's occupation as a known-risk factor.

Respondent's expert, Dr. Sanford M. Lewis, testified that in his opinion Fiore's cardiac disease was not work-related, but was due to general-risk factors. He found it "extremely improbable" that exposure to carbon monoxide at work "related to the development or progression of the underlying coronary artery disease." In support of his testimony, Dr. Lewis referred to an article, *Fire Fighting and Coronary Heart Disease, Circulation*, vol. 65, no. 5 (May 1982). The article demonstrates that firefighters, although exposed to carbon monoxide in a great degree, do not have "an excess risk of coronary artery disease." He also cited an editorial, *Smoking and Coronary Artery Disease, Chest*, vol. 94, no. 3 (Sept. 1988), that discussed the connection between cigarette smoking and heart disease without identifying carbon monoxide as the harmful agent in smoking.

In rebuttal, Dr. Velez introduced two articles, *Effect of Carbon Monoxide on Cardiovascular Disease, Preventive Magazine*, vol. 8 (1979), and *Mortality in Police and Fire Fighters in New Jersey, Am.J.Ind.Med.*, vol. 9 (1986). He did not know of any articles discussing the effect of the exposure of truck drivers to

carbon monoxide, but opined that truck drivers are exposed to increased levels of such exposure.

Like Dr. Velez, Dr. Lewis had not conducted a blood test to determine the level of carbon monoxide in Fiore's blood. The record reflects, however, that a catheterization on August 13, 1986, revealed, among other things, moderate obstruction in the left ventricular function and two blockages in the left anterior descending coronary artery.

To summarize, the experts disagreed on the relative roles of Fiore's occupational-exposure and personal-risk factors as causes of his coronary condition. The resolution of their disagreement raises the question of medical causation, a question that involves the determination of the cause in fact of the disease. See Larson, *supra*, § 38.83(a) at 7–277.

-III-

-A-

Professor Larson describes dual causation as "any occupational-disease causation problem in which a personal element, such as smoking, combines with an employment element, such as inhalation of asbestos or textile fibres, noxious fumes, acrid smoke, or irritating dust, to produce lung cancer, emphysema, bronchitis and the like." 1B Arthur Larson, *Workmen's Compensation Law* § 41.64(a) at 7–465 (1987). The inherent dilemma in a dual-causation case is to determine whether the legal cause of the disease results from exposure to substances at work or to personal-risk factors. Compounding that problem is the difficulty of discerning the extent to which the dual exposures have contributed to the disease. Our task is not to create a standard of our own making, but to derive from the Act one that is consistent with the intent of the Legislature.

The initial problem is to ascertain the standard to apply in a dual-causation case involving an occupational disease that allegedly has caused coronary-artery disease and an angina attack. No

specific provision of the Act explicitly resolves the problem. Mindful that the Act is remedial legislation to be liberally construed, *Torres v. Trenton Times Newspaper*, 64 *N.J.* 458, 461, 317 *A.*2d 361 (1974), we search beyond the individual sections of the Act to discover the legislative intent.

■ We conclude that the more appropriate section to address the question of causation is not, as the Workers' Compensation judge and the Appellate Division decided, 7.2—the heart section, but *N.J.S.A.* 34:15–31 (subsequently described as "the occupational disease section" or "section 31"). We begin with the terms of the two sections.

Section 7.2 provides:

> In any claim for compensation for injury or death from cardiovascular or cerebral vascular causes, the claimant shall prove by a preponderance of the credible evidence that the injury or death was produced by the work effort or strain involving a substantial condition, event or happening in excess of the wear and tear of the claimant's daily living and in reasonable medical probability caused in a material degree the cardiovascular or cerebral vascular injury or death resulting therefrom.

> Material degree means an appreciable degree or a degree substantially greater than de minimis.

By comparison, section 31 states in relevant part:

> a. For the purpose of this article, the phrase "compensable occupational disease" shall include all diseases arising out of and in the course of employment, which are due in a material degree to causes and conditions which are or were characteristic of or peculiar to a particular trade, occupation, process or place of employment.

■ Both "heart" and dual-causation occupational-disease claims present difficult problems of causation. Pre-existing diseases can contribute substantially to either a heart attack or an occupational disease. On the assumption that employers take their workers as they find them, employers are "generally held fully responsible even though the work-connected event would not have caused any damage or at least very little damage except for the presence of the pre-existing disease...." Administrative Recommendation by Herbert Koransky, Director, Div. of Workmen's Compensation, *"Heart Problem,"* 20 *N.J. Workmen's Com-*

*pensation Law Study Committee: Transcript of Meetings* at 7 (1968). Accordingly, early heart cases in New Jersey reflect the presumption that "injury or death from heart disease is the result of natural physiological causes...." *Seiken v. Todd Dry Dock, Inc.*, 2 *N.J.* 469, 475, 67 *A.*2d 131 (1949); *see also Ciuba v. Irvington Varnish & Insulator Co.*, 27 *N.J.* 127, 138, 141 *A.*2d 761 (1958) (stating that "it is to be presumed that injury or death from heart disease is the result of natural physiological causes, and the onus is upon the claimant to prove by a preponderance of the probabilities that the employment was a contributing cause of the injury or death").

Dual-causation occupational-disease claims also are problematic. Legislatures are wary of compensating workers for diseases that might as "readily be contracted in every day life or in other occupations." 1B *Larson, supra*, § 41.33 at 7–373. In a sense, the resolution of the causation question reflects a court's perception of the legislative balance of the interests of employers, employees, and the public in allocating the costs of work-related injuries.

Neither section 7.2 nor section 31 neatly applies to an occupational heart-disease claim. Arguably, such a claim could fit under either section. To ascertain which section governs and the meaning of that section, we construe the sections in light of each other. A statute should be read as a whole and not in separate sections. Norman T. Singer, *Sutherland Statutory Construction* § 46.05 (5th ed. 1992). Our task is to harmonize the individual sections and read the statute in the way that is most consistent with the overall legislative intent. *State v. Sutton*, 132 *N.J.* 471, 479, 625 *A.*2d 1132 (1993). In this sense, the meaning of a statute is greater than the meaning of the sum of its individual parts.

The Legislature enacted section 7.2 to overcome the assumption that employers take their employees as they find them. The section imposes a stringent level of proof by explicitly requiring an employee to show that the work effort was "in excess of the rigors of the claimant's daily living and that the cause of the injury or death was job-related in a material degree...." Senate Labor,

Industry and Professions Committee, *Joint Statement to Senate Committee Substitute for Senate No. 802 & Assembly Committee Substitute for Assembly No. 840,* at 2 (Nov. 13, 1979).

The Legislature adopted section 7.2 to counter *Dwyer v. Ford Motor Co.,* 36 *N.J.* 487, 178 *A.*2d 161 (1962), which stated: "Benefits are not lost because the amount of the work stress was such that it might or could be duplicated in routine activity about the home or in customary movements or effort while there." *Id.* at 492, 178 *A.*2d 161. *Dwyer* eliminated the presumption that a heart attack is the result of natural causes by holding that a claimant must show only that the "ordinary work effort or strain in reasonable probability contributed in some material degree to the precipitation, aggravation or acceleration of the existing heart disease and the death therefrom." *Id.* at 493, 178 *A.*2d 161. In *Dwyer,* this Court expansively defined "material degree" to mean "a degree greater than *de minimis;* it means that there was some employment exertion capable medically of helping the attack—of furthering its progress." *Id.* at 493–94, 178 *A.*2d 161.

█ Section 7.2 modified *Dwyer* in two ways. First, the section requires proof that the work effort was "qualitatively more intense than the strain of the physical activity to which the worker was accustomed in his leisure time." *Hellwig v. J.F. Rast & Co.,* 110 *N.J.* 37, 48, 538 *A.*2d 1243 (1988). The section focuses "attention on the intensity and duration of the precipitating work effort or strain in evaluating its capacity to cause cardiac dysfunction." *Id.* at 50, 538 *A.*2d 1243. Second, section 7.2 redefines "material degree" to mean "an appreciable degree or a degree substantially greater than de minimis." As we concluded in *Hellwig,* "[w]e view the legislature's modification of the *Dwyer* criteria as an effort to require more reliable proof of the connection between work effort and cardiac dysfunction." *Id.* at 54, 538 *A.*2d 1243.

█ The Legislature enacted section 7.2 to prevent recovery from cardiac incidents that as a matter of circumstance happen to manifest themselves in the workplace. Thus, section 7.2 reinstates the presumption that coronary-artery disease and heart

attacks are the result of natural causes. Requiring a comparison between the work effort and daily-living effort relieves employers of liability for heart attacks that were as likely to have occurred outside the workplace.

By its terms, section 7.2 pertains to cardiovascular claims attributable to work effort or strain. To this extent, we agree with the Appellate Division, which observed:

> Here, petitioner is attempting to prove that his underlying coronary artery disease was itself caused by exposure to carbon monoxide at work. Section 7.2 is not designed for practical application to such a claim. Indeed, the language of *N.J.S.A.* 34:15–7.2 is hardly capable of being applied to occupational exposure to fumes or toxins which bring about cardiovascular disease. The work effort in such circumstances is irrelevant.... The fact that the present petitioner's work effort as a truck driver was "probably" more strenuous than his activities outside of work has no practical relationship to his claim that exposure to carbon monoxide fumes gave him coronary artery disease. Nor was there any relevance to his testimony that he took care of his lawn, painted his house, played with his son, and played racquetball. There was no assertion that these activities, despite the effort involved, exposed him to fumes or otherwise caused his underlying heart disease.
>
> [270 *N.J.Super.* at 537–38, 637 *A.2d* 578.]

-B-

Stated generally, the overall purpose of the 1979 amendments to the Act, which include sections 7.2 and 31, was to "make available additional dollars for benefits to seriously-disabled workers while eliminating, clarifying, or tightening awards of compensation based upon minor permanent/partial disabilities not related to the employment." Senate Labor, Industry and Professions Committee, *supra*, at 1.

The 1979 amendments modified section 31 in three ways. First, the Legislature deleted the pre-existing definition of occupational disease that included diseases *"due to the exposure of any employee to a cause thereof arising out of and in the course of employment."* *Ch.* 29, § 2, *N.J.S.A.* 34:15–31 (1949), *amended by N.J.S.A.* 34:15–31 (1979) (emphasis added). The purpose of the deletion was to ensure that employers would be liable solely for those diseases "characteristic of and peculiar to a particular

employment. . . ."  Senate Labor, Industry and Professions Committee, *supra,* at 2.

As one writer explains,

the practical effect of the revision is best presented by an example.  If an employee contracted pneumonia as a result of working in a freezer as a packer, the condition would be a compensable occupational disease because it would be due to a cause which is peculiar to the employment.  If the same employee contracted pneumonia as a result of incidental exposure to a fellow employee with pneumonia, however, this might not be compensable because the condition may not be due to a condition characteristic of or peculiar to the employment.

[Fred Kumpf, *Occupational Disease Claims Under the Workers' Compensation Reforms,* 12 *Seton Hall L.Rev.* 470, 473 (1982).]

Second, the Legislature added subsection b, which restricts compensability by providing: "Deterioration of a tissue, organ or part of the body in which the function of such tissue, organ or part of the body is diminished due to the natural aging process thereof is not compensable."  *N.J.S.A.* 34:15–31b.  Subsection b further restricts compensability by "excluding from compensability degenerative changes due to the natural aging process. . . ."  Senate Labor, Industry and Professions. Committee, *supra,* at 2.

Third, the Legislature redefined a "compensable occupational disease" both to restrict and broaden coverage.  The new definition restricted coverage by requiring that the disease be "due in a material degree" to "causes or conditions . . . peculiar to the place of employment."  In effect, the "material degree" standard imposes on a claimant a burden to "show a greater nexus between the malady and the employment."  Kumpf, *supra,* 12 *Seton Hall L.Rev.* at 473.

The amendment broadens coverage by adding the phrase "peculiar to the place of employment."  This addition "[e]xpand[s] the definition of 'compensable occupational disease' to include diseases due in a material degree to conditions characteristic of the place of employment."  *Statement,* Senate Amendments to Senate Committee Substitute for Senate No. 802, at 2 (adopted Dec. 3, 1979).  The expanded definition includes claims that result not only from a particular trade, but also from a particular place of employment.

For example, a teacher who develops asbestosis from working in a classroom with a flaking asbestos ceiling would be covered under section 31. *See* Steven L. Lefelt, *Workers' Compensation in New Jersey: A Critique of S–802,* 104 *N.J.L.J.* at 425 (Nov. 15, 1979).

By compensating diseases arising out of the workplace, and not the "ordinary diseases of life," section 31 comports with the rationale underlying the compensation of occupational diseases. Hence, the Legislature amended section 31 to eliminate a statutory provision that an employee was entitled to compensation for a disease due to "exposure from *a* cause arising out of and in the course of employment" or for deterioration due to the "natural aging process". *Ch.* 29, § 2, *N.J.S.A.* 34:15–31 (1949), *amended by N.J.S.A.* 34:15–31 (1979) (emphasis added). As Professor Larson explains, occupational-disease claims are an "inherent hazard of continued exposure to conditions of the particular employment. . . ." 1B Larson, *supra,* § 41.31 at 7–362.

Generally, then, both sections 7.2 and 31 are limited to work-related injuries. Although section 7.2 is limited to heart attacks caused by excessive work effort or strain, and section 31 to occupational diseases, both sections require that causation occur in the workplace. The subject claim, which relates to occupational exposure to carbon monoxide arising out, and in the course, of Fiore's employment, focuses on Fiore's working conditions. From our perspective, section 31 more readily fits the claim.

As the Appellate Division recognized, *supra* at 15–16, however, the first sentence of section 7.2 obscures the clarity of the legislative intent. By its terms, the section applies to "*any* claim for compensation for injury or death from *cardiovascular* or cerebral vascular causes . . ." (emphasis added). Both the Workers' Compensation judge and the Appellate Division, 270 *N.J.Super.* at 539, 637 *A.*2d 578, concluded that the Legislature could have intended section 7.2 to apply to a claim of occupational heart disease arising from cardiovascular causes. In sum, although the Legislature mentioned certain cardiovascular diseases, it did not address

specifically the issue of a dual-causation occupational disease that gives rise to a cardiovascular disability.

That omission leads us to "the land of mystery," *see* Benjamin N. Cardozo, *The Nature of the Judicial Process* 18 (Yale Univ. Press 1979), where the legislation is silent. In the absence of specific guidance, our task is to discern the intent of the Legislature not only from the terms of the Act, but also from its structure, history and purpose. *Roig v. Kelsey*, 135 *N.J.* 500, 515, 641 *A.*2d 248 (1994). Apparently, the Legislature enacted section 7.2 based on its understanding that heart attacks are usually caused by natural or non-occupational causes. Often both a heart attack and the attack's underlying cause result from personal-risk factors peculiar to the claimant's lifestyle and medical history. *Seiken, supra,* 2 *N.J.* at 475, 67 *A.*2d 131. To ensure that employers would be liable only for heart attacks caused by occupational factors, the Legislature provided in section 7.2 that a claimant must prove that the workplace substantially caused the attack. Section 7.2 achieves this result by requiring that a claimant prove that the work effort exceeded the claimant's normal efforts in daily living. In this sense, section 7.2 requires that the employment contribute something substantial to "offset the causal contribution of the personal risk." 1B Larson, *supra,* § 38.83(b) at 7–319.

Courts in other jurisdictions likewise have required more stringent standards of causation in cases involving personal-risk factors. *See, e.g., Farrington v. Total Petroleum Inc.,* 442 *Mich.* 201, 501 *N.W.*2d 76, 83 (1993) (concluding that myocardial infarction "must be significantly caused or aggravated by employment considering the totality of all the occupational factors and the claimant's health circumstances and nonoccupational factors"); *Sellens v. Allen Products Co.,* 206 *Neb.* 506, 293 *N.W.*2d 415, 417–18 (1980) (holding that question with worker who died of thrombosis of right coronary artery is "whether the injury was the result of a personal rather than employment risk" and requiring that "employment risk must offset the causal contribution of the personal risk");

*Cheshire Toyota/Volvo, Inc. v. O'Sullivan,* 129 *N.H.* 698, 531 *A.*2d 714, 715 (1987) (determining that heart-attack claimant suffering from pre-existing heart disease must show that employment contributed "something substantial to the heart attack"); *see also Market Food Distrib., Inc. v. Levenson,* 383 *So.*2d 726, 727 (Fla. Dist.Ct.App.1980) (concluding that worker suffering from pre-existing spinal disease who injured spine at work had to show employment exertion substantially contributed and was greater than worker's non-employment exertion); *Bryant v. Masters Mach. Co.,* 444 *A.*2d 329, 337 (Me.1982) (holding that employment must contribute substantial element to offset personal risk of pre-existing condition of "frozen knees," when employee fell from stool); *Rutledge v. Tultex Corp.,* 308 *N.C.* 85, 301 *S.E.*2d 359, 369–70 (1983) (holding that chronic obstructive lung-disease claimant also suffering from asthma and allergies was entitled to compensation if occupational exposure "significantly contributed" to disease's development); *McCloskey v. Workmen's Compensation Appeal Bd.,* 501 *Pa.* 93, 460 *A.*2d 237, 241 (1983) (holding that compensable claim exists even if multiple causes of death from lung disease are present, so long as claimant shows occupational disease was substantial contributing factor).

We doubt that the Legislature intended a more relaxed standard to apply under section 31 to coronary disease resulting from occupational exposure than applies under section 7.2 to cardiovascular injury caused by work effort. When the injury or disease is heart-related, the enhanced standards of section 7.2 naturally extend to other cardiovascular claims.

Consequently, we believe we best effectuate the legislative intent by holding that a petitioner claiming an occupational heart disease must show causes or conditions characteristic to the occupation or place of employment that substantially contributed in a material way to the disease. To satisfy the standard, a petitioner claiming occupational heart disease must fulfill three requirements. First, as section 31 provides, the petitioner must show that the disease is due in "a material degree" to causes

"arising out of the workplace and that are or were characteristic of or peculiar to a particular trade, occupation, process or place of employment." 1B *Larson, supra*, § 41.64(c) at 7–479.

Second, the petitioner must prove "by suitable medical evidence that the employment exposure did indeed cause or contribute to the disease—especially in the light of the competing claim of the smoking to be the causal agent." 1B *Larson, supra*, § 41.64(c) at 7–479. We doubt that the Legislature, when enacting section 7.2, contemplated that employers should compensate employees for coronary disease caused substantially by a lifetime of smoking or other personal-risk factors and immaterially by occupational exposure. Thus, a petitioner asserting an occupational heart-disease claim must show that the work exposure exceeds the exposure caused by the petitioner's personal-risk factors.

Third, the petitioner must show that the employment exposure substantially contributed to the development of the disease. An occupational exposure substantially contributes to the development of coronary-artery disease when the exposure is so significant that, without the exposure, the disease would not have developed to the extent that it caused the disability resulting in the claimant's incapacity to work. *Rutledge, supra*, 301 *S.E.*2d at 370.

The determination that occupational conditions have substantially caused coronary-artery disease generally will require, in addition to medical testimony, proof of other relevant circumstances, such as: (1) the extent of the worker's exposure to the alleged occupational condition; (2) the extent of other non-work-related exposures and conditions; and (3) the manner in which the disease developed with reference to the claimant's medical and work history. See *Rutledge, supra*, 301 *S.E.*2d at 372.

The "substantial contribution" requirement should be read in light of the requirements of both sections 31 and 7.2 that the disease be "due in a material degree" to the workplace. Section 31 requires that a "compensable occupational disease" be "due in a

material degree" to causes or conditions in the workplace. We read that requirement in light of section 7.2's definition of "material degree" as meaning "an appreciable degree or a degree substantially greater than de minimis." Cases interpreting other sections of the Act likewise have followed section 7.2's definition because "[a]ttributing the same meaning to the phrase ... is in harmony with the general rule that a word or phrase should have the same meaning throughout the statute in the absence of a clear indication to the contrary." *Perez v. Pantasote, Inc.*, 95 *N.J.* 105, 116, 469 *A.*2d 22 (1984), (applying section 7.2 meaning to section 36); *see also Peterson v. Hermann Forwarding Co.*, 267 *N.J.Super.* 493, 494, 631 *A.*2d 1274 (App.Div.1993) (applying section 7.2 definition to section 31), *certif. denied,* 135 *N.J.* 304, 639 *A.*2d 303 (1994).

The "material degree" standard requires courts to evaluate carefully an expert witness's conclusion "in the context of both the statutory criteria and prevailing medical standards." *Hellwig, supra,* 110 *N.J.* at 54, 538 *A.*2d 1243. The evaluation should

> take into account the worker's medical history, the intensity and duration of the precipitating work effort, and the time interval between the work effort and the evidence of heart dysfunction. Compensation judges should be particularly skeptical of expert testimony that supports or contests a finding of causation on the basis of reasoning inconsistent with prevailing medical standards.

[*Ibid.*]

See *Walck v. Johns–Manville Prods. Corp.*, 56 *N.J.* 533, 556, 267 *A.*2d 508 (1970) (reasoning under prior section 7.2 that "material degree" means that a heart attack "must be due in some realistic sense and material degree to a risk reasonably incidental to the employment, the attack must issue from or be contributed to by conditions which bear some essential relation to the work or its nature"); *cf. Goyden v. Judiciary, Superior Court,* 256 *N.J.Super.* 438, 458, 607 *A.*2d 651 (1991) (stating that "[t]he question is whether objectively verified stressful work conditions found in this case were established which were 'peculiar' to the workplace and which justified the medical opinion that they were the 'material'

causes of [worker's depression]"), *aff'd per curiam*, 128 *N.J.* 54, 607 *A.*2d 622 (1992).

Accordingly, the Appellate Division has emphasized the need for objective evidence demonstrating that the workplace is a material cause of a disease. In *Wernowski v. Continental Can Co.*, 261 *N.J.Super.* 269, 618 *A.*2d 882 (App.Div.), *certif. denied*, 133 *N.J.* 437, 627 *A.*2d 1142 (1993), the court sustained the decision of a Workers' Compensation judge that the petitioner did not suffer from aluminum poisoning, but remanded for a determination whether petitioner's workplace exposure to aluminum dust had caused his perception that he so suffered. On remand, the workers' compensation judge was to consider the duration and extent of petitioner's exposure, the reasonableness of his psychological response to a medical diagnosis of aluminum poisoning, and whether any unrelated event may have triggered his disorder. As the court stated, "the issue is whether there is objective evidence that the repetitive stimuli, viewed realistically, were peculiar to the workplace. If so, there must be competent, objective medical evidence that the psychiatric disorder is 'due in a material degree' to the repetitive workplace stimuli." *Id.* at 275, 618 *A.*2d 882.

Similarly, in *Wiggins v. Port Auth.*, 276 *N.J.Super.* 636, 648 *A.*2d 743 (1994), the Appellate Division determined that a grounds keeper at Newark Airport who was diagnosed with multiple sclerosis did not have a compensable occupational disease. The petitioner claimed that his occupational exposure to gardening chemicals, high temperatures, and general stress had exacerbated his multiple sclerosis. Noting that petitioner's expert could not identify any medical literature that found a causal connection between toxins and multiple sclerosis, the court concluded that "petitioner did not provide any objective medical or scientific evidence establishing a causal link between chemical exposure and temperature variations and the exacerbation of his multiple sclerosis." *Id.* at 644, 648 *A.*2d 743.

Finally, in *Perez v. Monmouth Cable Vision*, 278 *N.J.Super.* 275, 650 *A.*2d 1025 (1994), the Appellate Division affirmed a

compensation award for a cable television installer who claimed that occupational exposure had led to the disability of his right hand. Specifically, the petitioner alleged that his constant "climbing, installing, pulling wire [and] carry[ing] ladder[s]" had aggravated a pre-existing injury to his right wrist. *Id.* at 277, 650 *A.*2d 1025. The Appellate Division stated that a claim must rest on demonstrable objective medical evidence, which includes " 'clinical and laboratory tests by the physician. The medical diagnosis usually looks for, and is in terms of, observable, measurable, physical manifestation.' " *Id.* at 284, 650 *A.*2d 1025 (quoting *Saunderlin v. E.I. DuPont Co.,* 102 *N.J.* 402, 508 *A.*2d 1095 (1986)).

Although proof in workers' compensation proceedings may differ somewhat from that in judicial proceedings, a petitioner must provide sufficient credible evidence to support a claim for compensation. On remand, petitioner, if possible, should adduce more specific evidence, perhaps through a toxicologist or other qualified expert, of the amount of carbon monoxide in diesel exhaust. Furthermore, like the Appellate Division, 270 *N.J.Super.* at 541, 637 *A.*2d 578, we believe that petitioner should provide such evidence, either through the testimony of a qualified expert or through scientific literature, of the effect of diesel fumes on workers, particularly on truck drivers.

Generally, moreover, the parties should adduce reliable scientific evidence about exposure to fumes in the workplace. Here, the record does not reflect any tests of petitioner's work environment. Petitioner's testimony provided the only evidence about diesel fumes. In most cases, employers are better situated than employees to test the workplace for exposure to harmful substances. If, as may be the case here, the employer has not conducted such tests, or if the judge finds the tests are unreliable, the employee's testimony may suffice. An injured worker should not be denied recovery because the employer has failed to determine whether the workplace is safe.

In sum, the parties generally should provide more reliable evidence than the record reflects. Although we do not want to impose an undue evidentiary burden on the parties, the interests of truth and justice require the production of sufficient credible evidence to support the decision of the Workers' Compensation judge.

The inescapable problem here, as the testimony of the medical experts for both petitioner and respondent makes clear, is that Fiore's heart disease may be more readily attributable to personal factors than to those that are work-related. To satisfy the requirement that the occupational disease arose out of his employment, Fiore must show that his work exposed him to greater risks than those in his daily life. For example, Fiore should show that his occupational exposure to carbon monoxide exceeded his exposure to carbon monoxide from cigarettes.

At the hearing, Consolidated did not contest Fiore's testimony about his exposure to carbon monoxide. Neither Fiore nor Consolidated provided specific evidence of the amount of carbon monoxide found in diesel exhaust, at Consolidated's freight terminal, or in the driving cabin of a Consolidated truck. They did not provide specific evidence about either the amount of carbon monoxide to which a daily smoker of two packs of cigarettes is exposed or the other effects of smoking on the cardiovascular system. Nor did they provide results of tests that would indicate the carbon monoxide in Fiore's blood. Even if such tests will not reveal the source of the carbon monoxide, they will disclose its presence.

Specific testing of working conditions can provide persuasive evidence. Courts in other states have more readily affirmed compensation awards when specific testing of the air quality in the work environment had been conducted. *See, e.g., Wood v. Ulmer's Car & Truck,* 236 *Mont.* 353, 769 *P.*2d 1264 (1989) (affirming award of compensation for mechanic's heart-disease and attack claim due to carbon-monoxide exposure where garage tested for. presence of carbon monoxide revealed levels of gas present that

could have posed health risk); *Mitchell v. Ideal Cement*, 813 P.2d
1044 (Okla.1991) (sustaining compensation court's denial of bene-
fits for worker's respiratory claim due to purported exposure to
dust and fumes when employer conducted air quality tests at
workplace showing air levels would not cause harmful effects to
workers); *Yakemowicz v. Workmen's Compensation Appeal Bd.*,
59 *Pa.Cmwlth.* 41, 428 A.2d 781 (1981) (affirming denial of com-
pensation for dispatcher's heart-attack claim due to carbon-monox-
ide exposure when claimant offered no evidence indicating per-
centage of carbon monoxide emitted from towmotor).

-IV-

The final issue concerns apportionment under *N.J.S.A.* 34:15–
12d, which provides an employer with a credit for an employee's
"previous loss of function to the body, head, a member or an
organ." To encourage employers to hire workers with previous
disabilities, the Legislature included *N.J.S.A.* 34:15–12d in the
1979 amendments to the Act. See *Abdullah v. S.B. Thomas, Inc.*,
190 *N.J.Super.* 26, 29–30, 461 A.2d 1179 (App.Div.1983) (summar-
izing purpose of section 12d). Under that section, which counter-
acts the prior rule that employers take employees as they find
them, an employer is entitled to a credit for an employee's
previous loss of function to the same body part as that caused by
the occupational disease.

*N.J.S.A.* 34:15–12d provides:

> If previous loss of function to the body, head, a member or an organ is
> established by competent evidence, and subsequently an injury or occupational
> disease arising out of and in the course of an employment occurs to that part of the
> body, head, member or organ, where there was a previous loss of function, then
> and in such case, the employer or the employer's insurance carrier at the time of
> the subsequent injury or occupational disease shall not be liable for any such loss
> and credit shall be given the employer or the employer's insurance carrier for the
> previous loss of function and the burden of proof in such matters shall rest on the
> employer.

In an analogous case involving a worker with a history of
smoking who contracted asbestosis, the Appellate Division ruled
that a Workers' Compensation judge should "give the employer

credit for the functional loss attributable to cigarette smoking when that loss can be quantified." *Field v. Johns–Manville Sales Corp.*, 209 *N.J.Super.* 528, 530, 507 *A.*2d 1209, *certif. denied,* 105 *N.J.* 531, 523 *A.*2d 172 (1986); *cf. Dafler v. Raymark*, 259 *N.J.Super.* 17, 611 *A.*2d 136 (App.Div.) (affirming judgment in products liability action that apportioned responsibility between asbestos and cigarette smoking), *aff'd o.b.* 132 *N.J.* 96, 622 *A.*2d 1305 (1993).

Here, the worker's compensation judge did not address apportionment. Although the Appellate Division mentioned the issue, it recognized that it was "dealing with concomitant causes . . .," 270 *N.J.Super.* at 543, 637 *A.*2d 578, and made "no holding on this additional issue as there is no evidence of aggravation in the present case," *id.* at 545, 637 *A.*2d 578.

We likewise find that the record does not provide a suitable basis to analyze the issue of apportionment. To the extent that apportionment is relevant on remand, we note that the Legislature has explicitly allocated the burden of establishing a previous loss of function "on the employer." *N.J.S.A.* 34:15–12d.

Because our construction of the Act differs from that of the Workers' Compensation judge and the Appellate Division, we remand the matter to the compensation judge for redetermination consistent with this opinion. In remanding, we express no view about the compensability of Fiore's condition.

The judgment of the Appellate Division is reversed, and the matter is remanded to the Division of Workers' Compensation.

*For reversal and remandment*—Chief Justice WILENTZ, and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—6.

*Opposed*—None.